THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE ROSA, Appellant.

First Department, May 30, 1985

**APPEARANCES OF COUNSEL**

*Joseph Scott, Jr.,* for appellant.

*Seth L. Marvin* of counsel (*Billie Manning* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

Ross, J.

The defendant is appealing from his conviction by a Bronx jury of the crimes of manslaughter in the first degree (Penal Law § 125.20 [1]), two counts, and of criminal possession of a weapon in the second degree (Penal Law § 265.03), two counts.

At about 1:40 A.M. on November 22, 1981, Warren Norman (Norman) and his partner, who were New York City Housing Authority Police Officers, were in uniform seated in a marked radio car, when they received a radio report of shots fired on the ninth floor of 205-207 Alexander Avenue, The Bronx. Following receipt of this message, these officers immediately responded,

and they arrived at the subject location, within less than a minute.

Building number 205-207 is part of the Mitchell Housing Project, and this particular building consists of 16 floors, two elevators and two stairwells.

After their arrival, these officers entered the building. Officer Norman went up the flight of stairs marked stairwell A, while his partner went up the other flight of stairs marked stairwell B. At the ninth-floor landing, Norman found the bodies of 23-year-old Sole Santos (Mr. Santos) and that of his 19-year-old wife Carmen Rosa Santos (Mrs. Santos), who was the defendant's niece. The decedents had been shot to death with a .38 caliber revolver.

Shortly thereafter other police officers came to the crime scene, and, *inter alia,* inspected the bodies and searched the area.

The body of Mrs. Santos was lying on her back, face up, with her feet on top of the upper portion of Mr. Santos' body.

Neither the clothing nor the personal property, such as the jewelry and money, of the decedents appeared to have been disturbed.

The ninth-floor hallway smelled like a gun had been recently discharged there. This odor of gunpowder permeated from the ninth to the fifteenth floor. Recovered from the tenth-floor landing was a .38 caliber bullet, and a small clothing bag, which belonged to one of the decedents. Between the ninth- and tenth-floor landings, Mrs. Santos' slippers and Mr. Santos' hat were found. Furthermore, between the tenth- and eleventh-floor landings, a bullet crease was found on the ceiling. Norman retrieved two .38 caliber bullets from underneath Mr. Santos' body.

The searching officers found a set of keys in Mrs. Santos' pocketbook, to the defendant's apartment, which was located on the fifteenth floor. As a result of locating these keys, the police went to defendant's apartment, 15F, and informed him that Mr. and Mrs. Santos had been shot.

In August 1981, Mr. and Mrs. Santos had been married. Subsequently, about one month later, following a dispute with Mr. Santos, the mother of Mrs. Santos sent her from Puerto Rico to live with the defendant, who, as mentioned *supra,* was Mrs. Santos' uncle, until Mrs. Santos' marital problems were resolved.

At about 2:30 A.M., the defendant came down to the ninth floor and identified the bodies as those of Mr. and Mrs. Santos. Officer

Norman testified at trial that defendant "did not appear to be emotionally disturbed by the sight of the bodies". The defendant, at this point, was attired in a white tee shirt, dark-colored workman's pants or dungarees and bedroom slippers.

When the defendant viewed the bodies, standing in the hallway was Ms. Hernanda Bonilla (Bonilla), who had resided in apartment 9B for about three years.

Earlier that evening at about 9:00 P.M., Ms. Bonilla had left her apartment to attend a party. As she waited for the elevator, she saw a couple hugging, which couple then entered the ninth-floor staircase around the corner from the elevator. Subsequently, Ms. Bonilla learned that this couple were the decedents. At the party, Ms. Bonilla consumed some alcoholic beverages, but she claimed that, when she left the party at around 1:00 A.M., she was not drunk.

Ms. Bonilla came back to the subject building at approximately 1:25 A.M., and took the elevator to the ninth floor. She was just putting the key in the lock to open her apartment door, when she heard a shot and screams. There was no one else in the hallway. In response to that noise, she ran to the incinerator, but when she heard nothing more, she started to return to her apartment. However, as she passed apartment 9A, she heard more shots, so she turned and ran to the door to the staircase, where previously she had seen the couple, mentioned *supra,* enter. She now stood by this door and looked through the door window into the stairwell, and saw Mr. and Mrs. Santos tumble down the stairs and land close to each other. As she continued to watch through this window, Ms. Bonilla saw defendant, who she recognized as a porter who worked in the project, come halfway down the stairs from the tenth floor, look at the bodies, and then walk back up to the tenth floor. Ms. Bonilla testified that when she saw the defendant viewing the bodies on this occasion, he was wearing "boots * * * a pea coat" and "dark blue pants". Now, Ms. Bonilla ran to the other staircase on her floor, opened the door to the stairwell and crouched down beside it. From this vantage point, she looked up and saw the defendant walking toward and opening the tenth-floor door of the staircase. Thus, the defendant, according to the testimony of Ms. Bonilla, had switched staircases. After the defendant made this switch, Ms. Bonilla watched the defendant walk upstairs. Thereafter, Ms. Bonilla ran back into her apartment, where she remained until some minutes later when she heard the police, and came out into the hallway, where, as mentioned *supra,* she again saw defendant.

When the defendant saw Ms. Bonilla, she testified, that "he [defendant] started shaking and I [Ms. Bonilla] told him to take it easy, but I was scared myself." The defendant told Ms. Bonilla that "he had to call his wife", and Ms. Bonilla permitted the defendant to use her telephone. However, the defendant received a busy signal, and, therefore, he left her apartment to return to his own.

Sometime after 3:00 A.M. that morning, New York City Police Detective Ronald Marsenison (Marsenison) interviewed the defendant and his wife concerning the shootings. In substance, Detective Marsenison testified that defendant and his wife told him that Mrs. Santos had come to live with them about three months earlier; that during this three-month period, Mrs. Santos kept in touch with Mr. Santos and planned a reconciliation; that, on the day before the shootings, Mr. Santos arrived in New York City from Puerto Rico; that, about 1:00 P.M. on the day of his arrival, Mr. Santos came to defendant's apartment and received permission to take Mrs. Santos to visit relatives of Mr. Santos, who lived in New Jersey; that Mr. Santos had said he and Mrs. Santos would return later that afternoon; that, when Mr. and Mrs. Santos had not returned by 8:30 P.M., the defendant and his wife began to worry; that, at about 8:30 P.M. that evening, a relative of the defendant and his wife saw Mr. and Mrs. Santos standing in the lobby of the building; that, then, Mrs. Santos introduced her husband to the said relative; that, thereafter, this relative telephoned defendant and his wife and told them not to worry any longer about the whereabouts of this young couple; that, at approximately 11:30 P.M., defendant and his wife went to sleep; and, that allegedly about 2:00 A.M. they were informed by the police about the shootings and asked to identify the bodies.

Subsequently, on November 23, 1981, the day after the shootings, another New York City Police Detective named Thomas Lonergan (Lonergan), interviewed defendant again and defendant told Detective Lonergan basically the same story that he had told Detective Marsenison.

Detective Lonergan was assigned to investigate the shootings on a continuing basis. On either April 1 or 2, Detective Lonergan learned of the existence of Ms. Bonilla. As of that date, Ms. Bonilla, who had been an admitted drug abuser and who had a criminal record which included felony convictions involving violation of the narcotics laws and burglary (note: This burglary conviction arose out of an incident in which, while Ms. Bonilla was outside of an apartment being burglarized, her accomplices

and the victim began to fight and the victim was killed), had not yet revealed what she had seen in the stairwell on the night of the killings.

In the 40th Precinct on April 3, 1982, Detective Lonergan interviewed Ms. Bonilla for several hours. Over this span of time, Ms. Bonilla told Detective Lonergan much of what she had seen on the night of the shootings and she wrote out a statement about those alleged facts.

Four days later, on April 7, Detective Lonergan talked to defendant once more. This time the interview took place in the 40th Precinct station house. Detective Lonergan testified: "I asked him [defendant] again about the night of the 21st and morning of the 22nd. I asked him why wouldn't [Mr. and Mrs. Santos] come upstairs. He expressed to me that he did not want [Mr. Santos] staying in his house, because [Mr. Santos] was a stranger. I [Detective Lonergan] said, he's married to your niece and he said he is a stranger. He said, 'I have young daughters in my house and I didn't want to have him in the house'; to indicate why he did not come up earlier."

On Saturday, April 10, Ms. Bonilla telephoned the 40th Precinct to speak to Detective Lonergan, but he was not there. Finally, on April 13, Ms. Bonilla voluntarily went to the precinct and saw Detective Lonergan and told him the complete version of what she claimed she had seen on the night in issue.

The medical examiner, after examining the bodies of Mr. and Mrs. Santos, concluded that the wounds each decedent suffered were consistent with the gun being fired in a downward position.

On April 15, 1982, the defendant was arrested by Detective Lonergan for the killings of Mr. and Mrs. Santos. Subsequently, on April 23, defendant was indicted.

After the People put in their case, which included testimony from Officer Norman, Ms. Bonilla, Detectives Marsenison and Lonergan, the medical examiner and a ballistics expert, the defense put in its case.

In substance, the defense was alibi. The defendant testified, as did his wife and his 15-year-old daughter. These three defense witnesses testified, in effect, that defendant was in the apartment at the time that Mr. and Mrs. Santos were killed. Specifically, defendant denied shooting Mr. and Mrs. Santos. Defendant admitted in his testimony that he knew Ms. Bonilla, that he had never had a fight with her, and that he did not know of any reason why Ms. Bonilla would testify that she had seen him in the stairwell at the time that she heard the shots. Also, the defense called two character witnesses.

Even though most of the evidence against defendant was circumstantial, after reviewing the record, we find that the evidence was sufficient to support the guilty verdict of the jury (*People v Waiters,* 97 AD2d 356 [1st Dept], *lv denied* 61 NY2d 679). "[I]f this case had been tried without the numerous errors [committed by the trial prosecutor], hereinafter discussed [defendant's] conviction would have been readily affirmed. However, the cumulative effect of these several errors denied [defendant] a fair trial" (*People v Dowdell,* 88 AD2d 239-240 [1st Dept]).

Our examination of the record leads us to conclude that the prejudicial errors of this prosecutor continued through the entire trial. These errors were so numerous that many of them will only be referred to by reference to pages in the trial transcript. Some of the more flagrant of these errors are set out in detail, *infra.*

For example, the prosecutor's examination and cross-examination.

(A) Early in this case the Trial Judge repeatedly warned the prosecutor not to lead the People's witnesses but, this experienced prosecutor rejected these admonitions. The prosecutor's disobedience became so open and notorious that the following statement was made by the Trial Judge to the prosecutor in chambers: "THE COURT: * * * There was an objection by counsel. You [prosecutor] turned right around looked at me [the Trial Judge] and you said something that was extremely leading and if you do not know it then you don't know your rules of evidence. You said, was there confusion? Now, a leading question is a question that puts in the mouth of the witness the answer. So what you did was turn immediately around, after the situation was sustained, if you wanted to stop and think for a moment and say, Judge, may I pause for a moment, so you [could] have an opportunity to rephrase, fine, well what you did was you turned right around and asked an extremely leading question. Now, all this witness had to say is, yes. Was there confusion? That is like asking a question was the gun still smoking; was the lamp lit. You cannot testify at this trial, Mr. Apicella [the prosecutor]."

Instead of improving his questioning technique, the prosecutor on cross-examination even more blatantly violated defendant's rights. We find that he repeated questions on a regular basis after objections had been sustained to them. Again, during cross-examination just as during direct examination, the Trial Judge was compelled, by the prosecutor's disregard of rulings, to make the following statement to him in chambers: "THE COURT:

If you [Mr. Apicella] do that again I am going to fine you $100 and hold you in contempt of Court. You do not decide when a witness is going to make a statement, after I make a ruling. If you don't like the ruling I made you ask for a side bar and you come in here and you put anything you want on the record that you want to put in. You don't ask the witness after I make a ruling if there is some sort of explanation that you want to make."

During cross-examination, the Trial Judge had to caution the prosecutor in chambers about shouting at the defendant's wife, Nydia Rosa.

Furthermore, the Trial Judge had to admonish the prosecutor about his unprofessional conduct, concerning the manner in which he protested the court's adverse rulings. In pertinent part, the Trial Judge stated in chambers:

"THE COURT: I am amazed and I want to make sure this is on the record, you seems [sic], Mr. Apicella, when the Court makes a ruling and you don't like that ruling you look at the Court and you look at me [the Trial Judge] and I notice that you have been looking at me, because I have been looking at you and when you look at me you frame a question the very same question designed to draw the very same answer that was just objected to and you do it repeatedly and I have told you this before and I am asking you again to cease and desist * * *

"I don't want any contemnation [sic] or obdurance [sic] conduct in the middle of the trial, in front of the jury * * *

"May I suggest to you [the prosecutor] that quite often your facial expressions have carried your disbelief and astonishment by way of non-verbal communications to all 16 members of the jury panel."

We find that "the prosecutor's * * * cross-exmination was conducted in a sarcastic, repetitive manner which could only have been intended to convey to the jury his own ill-concealed contempt for the defendant" (*People v Hicks,* 102 AD2d 173, 183 [1st Dept]).

In his summation, the prosecutor deprived the defendant of a fair trial by: (a) bolstering the People's case by personally vouching for the credibility of the testimony of Ms. Bonilla, mentioned *supra;* and (b) unfairly attacking the testimony of defendant. Some illustrations appear *infra.*

"MR. APICELLA: * * * She [Ms. Bonilla] told you how ten years ago she had a drug problem and as a result of her drug addiction she got involved in burglary with her brother and her lover

which resulted in a man being killed. She pled guilty. She went to jail, that was ten years ago. She did wrong. She admitted it. She has paid for her crimes. She has got to live with her past for the rest of her life. Twenty character witnesses would not erase the past. That has happened, but I submit this is not the same person who came in here and testified. It is not the same Hernanda Bonilla of ten years ago.

"MR. CARROZZA [defense counsel]: Objection.

"THE COURT: Sustained * * *

"THE COURT: [Now in Chambers, with counsel] * * * Mr. Apicella, that you are, sir, making yourself an unsworn witness and when you indicate before this jury that Miss Bonilla is not the same person that appeared in this court ten years ago, you are now making yourself an unsworn witness ... and * * * you are bolstering your witness * * * I warn you and ask you to cease and desist from this form of summation. If you persist in this situation, it can only, to my mind, go to a conclusion of prosecutorial misconduct in that if you continue to ... make improper argument you will be evading the Court's ruling".

After returning to the courtroom, we find that the prosecutor completely ignored the direction that he had just received from the Trial Judge, and resumed his personal vouching of Ms. Bonilla's credibility.

Moreover, we find the prosecutor commented unfairly during summation about the defendant:

"MR. APICELLA: Now, finally we have the defendant himself, Jose Rosa. I submit who has the greatest interest in the outcome of this case? Who has the most to lose, this man. Now, he told his story last. The last one to get up and testify after hearing all that the other witnesses had to say —

"MR. CARROZZA: Objection. Judge.

"THE COURT: Sustained; I take this opportunity to remind you ladies and gentlemen of the jury, the defendant is being charged with a crime and he has a perfect right to sit here from the very inception of the case until the end that he is a necessary part to this kind of proceeding. All right. Go ahead."

Besides the errors the prosecutor committed, *supra,* which we discussed and found prejudicial, he also committed additional errors such as acting as an unsworn witness in bringing to the attention of the jury facts not introduced into evidence; and asking questions about collateral matters so as to prejudice the defendant by confusing and misleading the jury.

We said in *People v Perez* (90 AD2d 468, 470 [1st Dept]), where this same prosecutor represented the People, "the totality of this persistent misconduct deprived the defendant of his right to a fair trial."

It is quite obvious from the record, that this prosecutor learned nothing from this court's criticism in *People v Perez* (*supra*). Here, as in *Perez,* he continually attempted to evade the court's rulings, despite numerous warnings by the court. The *Perez* case was decided about six months prior to the trial of this case. In view of the fact that the prosecutor was on notice that his conduct in *Perez* was criticized by this court, his conduct and actions in the present case can only be viewed as willful and deliberate. Further, the prosecutor received seemingly countless admonitions relative to his use of leading questions, to no avail. The most significant and egregious acts of prosecutorial misconduct arose from the prosecutor's disregard of the court's rulings and warnings as to his conduct. We must conclude that his constant and deliberate evasions of the court's rulings and caveats, cannot be attributed to an occasional lapse due to the pressures of a trial. The prosecutor "exceeded the bounds of legitimate advocacy" (*People v Shanis,* 36 NY2d 697, 699).

As this court stated, as recently as 1982, in *People v Dowdell* (*supra,* at p 248): "Each of the afore-mentioned errors was, in all likelihood, harmless, especially in light of the overwhelming evidence against [defendant] and would not normally warrant this court's intervention on the interests of justice basis. However, the harmless error analysis is not unlimited. We cannot ignore the numerous errors that occurred at this trial and still label them 'harmless'. Ultimately, sufficient harmless errors must be deemed 'harmful'. This court is of the opinion that such a point has been reached and surpassed in this case. The cumulative effect of these errors was to effectively deny defendant a fair trial."

Certainly, we are not required, at this late date, to set forth the duties of counsel during trial. Although we do not expect that every trial will be totally free of any error, we cannot and will not permit a conviction in a criminal trial to stand, where continuing misconduct by the prosecutor prevented a fair trial. "Evenhanded justice requires more and, as the ultimate guardian of the rights of the People and defendants in the State, we have a right to expect more." (*People v Alicea,* 37 NY2d 601, 605.)

Accordingly, the judgment of the Supreme Court, Bronx County (George D. Covington, J.), entered March 18, 1983,

which convicted the defendant, following a jury trial, of the crimes of two counts of manslaughter in the first degree (Penal Law § 125.20 [1]) and two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03) and sentencing him to concurrent indeterminate terms of imprisonment of 8⅓ to 25 years on each manslaughter count and 4½ to 15 years on each weapons possession count, should be reversed, on the law, the facts, and as a matter of discretion in the interest of justice, and the matter is remanded for a new trial.

KUPFERMAN, J. P., BLOOM, KASSAL and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on March 18, 1983, unanimously reversed, on the law, the facts, and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.