THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK SANDY, Appellant.

First Department, March 6, 1986

APPEARANCES OF COUNSEL

*Sheila A. Murphy* of counsel *(Paula P. Smith* and *Philip L. Weinstein* with her on the brief; *William E. Hellerstein,* attorney), for appellant.

*Elisa F. Spatola* of counsel *(Mark L. Freyberg* with her on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

CARRO, J.

Reversal may well be an ill-suited remedy for prosecutorial misconduct when the cumulative effect of that conduct has not impinged detrimentally on a defendant's due process right to a fair trial or when the Trial Judge has nullified the prejudicial impact of that misconduct with prompt, curative instructions to the jury and forceful admonitions directed at the prosecutor. *(See, People v Galloway,* 54 NY2d 396, 399, 401.) However, when the misconduct is so pervasive, so egregious and results in violations of fundamental due process rights, and the prosecutor's disregard of the court's rulings and warnings is as deliberate and reprehensible as that of this prosecutor, who has twice before provoked reversals by this court *(People v Rosa,* 108 AD2d 531; *People v Perez,* 90 AD2d 468), a reversal is the only responsible remedy we can invoke as guardians of the rights of the People. While it would be an arduous task to recite the many instances of prosecutorial misconduct that occurred in this trial, in the interest of deterring such intolerable conduct in the future, some of the more flagrant examples of misconduct will be highlighted.

Because the deleterious effects of the prosecutor's misconduct are best appreciated in the context of the facts of this case, the following review is provided. On December 21, 1980, at around 8:30 P.M., Leander Dugan, decedent Henry "Justis" Lee, defendant Mark Sandy and Charles Herd, all friends of each other, were gathered together outside O'Leary's Bar in The Bronx. Lee and defendant stepped away from the others to have a private conversation. Albert Lockwood, another friend of the group approached and overheard defendant and Lee discussing money that Lee owed defendant. Lee, who appeared angry, and defendant were soon involved in an altercation which was to end fatally for Lee.

Testimony as to the details of the struggle, in particular the question of who was armed with a knife, conflicted sharply,

making credibility a crucial issue. The People's witness Lockwood testified that he heard "shuffling" behind him and turned to look at the two men, who had assumed boxing positions. Lockwood saw nothing in either man's hands, but saw defendant throw a punch towards Lee's chest and then bend down as if to hit Lee with an "uppercut". Lee then yelled out, and defendant backed off. Lee was grabbing his chest and staggered away spitting up blood. Defendant stood still, as if in shock.

Dugan, another People's witness, testified that he saw defendant holding a knife and wield it towards Lee's armpit. Lee turned his body into the knife, receiving his fatal wound. On cross-examination, Dugan, who could not describe the knife, inconsistently stated "I didn't see it."

Defense witness Charles Herd testified that before Lee approached defendant to talk to him, Lee had entered and then exited O'Leary's Bar with a knife, which he attempted to hide in his pocket. Lee then summoned defendant away from the group to talk to him and pulled the knife out of his pocket. During the struggle, Lee's body turned into the knife, as the two men battled with their hands on the knife.

Defendant testified that he and Lee spoke about a sum of money Lee owed him. Defendant noticed Lee trying to hide something. Soon Lee pulled out the knife and defendant grabbed the hand that held the knife. As they struggled, the knife went into Lee's chest as he turned toward it.

The medical examiner testified that Lee died within minutes of the stab wound which penetrated his chest wall and heart. The wound was delivered forcefully. Lee also sustained a knife cut along the back of his left thigh.

Lockwood testified that on the next night, defendant approached him to tell him that he wanted Lee's family to know he did not intend to kill Lee but intended only to cut him in the arm and leg. Lockwood and defendant proceeded to a phone booth where Lockwood dialed the Lee family's number. Lockwood heard defendant tell the person on the phone that "he was the one who", but Lockwood walked away before defendant finished speaking and he headed towards Lee's house 5 or 6 blocks away. When Lockwood arrived at the Lee house, Lee's aunt, Mrs. Weems, was speaking to someone on the telephone. Mrs. Weems testified that before the telephone went dead she heard a voice say "Justis [Lee's nickname] owed me money." The telephone rang again and Lockwood

answered one extension while Lee's brother and sister listened on another. Lee's brother heard a voice say that "Justis owed [me] money" and that the speaker "didn't mean to kill Justis, that he just wanted to cut him on the arm or leg." Defendant testified that what he told the person on the other end of the line was that it was a "self-defense thing" and it was only Lockwood who told the person that all defendant intended was to stab Lee in the arm and leg.

While we note that the evidence of guilt of manslaughter in the first degree may not have been overwhelming, it was certainly sufficient to sustain the verdict. However, the probability that the jury's verdict was tainted by the persistent and prejudicial conduct of the trial Assistant District Attorney dictates that we reverse this conviction. In the course of this trial, the prosecutor, among other things, violated the defendant's right to remain silent, improperly impeached defense witness Herd's credibility, because he had not immediately spoken to the police about this incident, introduced irrelevant, inflammatory and hearsay evidence at trial, continually asked leading questions which assumed facts not testified to, was argumentative with defense witnesses, implied that defendant's indictment was evidence of his guilt and improperly impugned defendant's credibility. Furthermore, as we stated before about this prosecutor: "The most significant and egregious acts of prosecutorial misconduct arose from the prosecutor's disregard of the court's rulings and warnings as to his conduct. We must conclude that his constant and deliberate evasions of the court's rulings and caveats, cannot be attributed to an occasional lapse due to the pressures of a trial. The prosecutor 'exceeded the bounds of legitimate advocacy' " *(People v Rosa,* 108 AD2d, at p 539).

In total disregard of the well-established rules that "[a] defendant is under no greater an obligation to incriminate himself by voluntarily contacting the police than he is by declining to mak[e] statements when confronted by law enforcement officials" *(People v Pressley,* 93 AD2d 665, 669) and that evidence of a defendant's pretrial silence may not be used for impeachment purposes, absent unusual circumstances not present here *(People v Conyers,* 52 NY2d 454), this prosecutor insisted on examining defendant about his failure to report to the police even after the court sustained objections to each of his first six questions and stated it would sustain objections to any other questions on this topic. Unwilling to abandon this vein of questioning, the prosecutor then asked appellant

whether he had told his witness Charles Herd to go to the police, forcing the court to instruct the jury that he had no obligation to do so. The court's ruling not having penetrated, the prosecutor questioned defendant further as to whether he had told Herd to speak to the police at the hospital and later commenced yet another series of questions concerning whether defendant had told anyone that he had acted in self-defense. Despite the court's instructions, the jury may very well have been left with the impression that defendant's self-defense claim was unworthy of belief, because defendant had not come forward with his defense to law enforcement officers.

The prosecutor, in a similar fashion, tried to impeach the credibility of the chief defense witness, Charles Herd, because of his failure to come forward immediately with his exculpatory testimony. A citizen has no legal obligation to volunteer such information to law enforcement officials, and it is, therefore, improper for the prosecutor to make such a suggestion. *(People v Dawson,* 50 NY2d 311, 317-318.) While a prosecutor can, however, cross-examine a witness on his failure to come forward, such questioning must be undertaken in good faith and only after the prosecutor has demonstrated, *inter alia,* that the witness was aware of the charges pending against the defendant when he failed to go to the police *(supra,* at p 321, n 4). Much of the questioning here centered on the time period when defendant had not yet been arrested and Herd was unaware of any charges, and was, therefore, improperly conducted in bad faith.

At other points in the trial the prosecutor, court rulings notwithstanding, continuously and relentlessly endeavored to place inadmissible hearsay before the jury. Apparently dissatisfied with how the prosecution witnesses Lockwood and Dugan were testifying, the prosecutor attempted to elicit from them their Grand Jury testimony, implying that their prior testimony was more favorable to the prosecution than their trial testimony. Perhaps most reprehensible in terms of his contemptuous disregard of the court's rulings, were the prosecutor's efforts to bring to the attention of the jury the contents of interviews which a detective and an Assistant District Attorney had with witnesses, some of whom never even testified. One particular exchange resulted in over 20 sustained objections, lectures to the prosecutor, instructions to the jury, and exasperated comments by the court.

Despite the court's clear and repeated rulings as to the inadmissibility of the interviews, the prosecutor later sought

to place them in evidence, much to the amazement of the court which responded, "you know it is not admissible," and "I don't know why you're doing that—if it's a question of trying to impress anybody, you're really not." Still undaunted, the prosecutor in summation again brought up this inadmissible hearsay and referred to matters that were absent from these interviews. Thus, despite the many sustained objections, which the prosecutor defiantly ignored, and the instructions to the jury, we are forced to conclude that the jury was unable to disregard the many inadmissible items to which they were exposed, thus prejudicing defendant's right to a fair trial.

Neither are we confident that the jury could ignore the many times the prosecutor imbued the record with irrelevant and inflammatory matters through his cross-examination of defendant, calculated no doubt to impugn his character. Such persistent questioning of defendant on collateral matters tending to denigrate him without being probative of the crime charged constitutes improper and prejudicial cross-examination. *(People v Hicks,* 102 AD2d 173, 182.) In disdainful disregard of court rulings, the prosecutor, on six different occasions, asked questions lacking absolutely any basis in the evidence to convey the idea that appellant was a drug seller and had a dispute over drugs with the decedent. The argument that the purpose of such questioning was to prove motive for the crime must be rejected out of hand. The motive for the fight, an argument over money, had already been admitted at trial. The questions had no basis in the record and were not asked in good faith, but, rather, were asked to raise the impermissible inference that defendant had a propensity to commit crimes *(supra,* at p 183). The prosecutor also on numerous occasions characterized things in an inflammatory way, such as saying that appellant's conversations with Lockwood and the Lee family were confessions.

Another species of improper conduct was the prosecutor's unceasing habit of asking leading questions which would assure that the jury heard facts which were never testified to and were inadmissible. As with this prosecutor's improper conduct in other areas, the court's rulings and warnings were to no avail.

Not only did this prosecutor seem to have different notions as to the rules of evidence, but he also seemed to have had problems accepting such fundamental legal concepts as the presumption of innocence and the proper burden of proof in a criminal case. Thus, despite the court's repeated and vehe-

ment instructions to the contrary, the prosecutor made statements conveying to the jury that defendant's indictment was evidence of guilt, a tactic for which this prosecutor was rebuked in *People v Perez* (90 AD2d, at p 469). His comments "I did not accuse Mark Sandy of killing Henry Lee, Jr.; that was not me. That was not the District Attorney's office * * * he was indicted by a grand jury who heard evidence" were clearly improper and prejudicial. Then, as if the rules on burden(s) of proof had been rewritten, the prosecutor argued several times that appellant would have to "explain" the cut on Lee's leg. In summation, he implied very strongly that the defense had an obligation to prove its case. Such tactics have been repeatedly condemned as error *(supra; People v Nunez,* 74 AD2d 805, 806; *People v Keough,* 51 AD2d 808, 809).

Other improper tactics were employed by this prosecutor who was decidedly bent on obtaining a conviction at any cost, in total abandonment of his duty to adhere to established rules of evidence, legal principles and court rulings, and in total disregard of his obligation as a quasi-judicial figure to see that a trial is fairly conducted and that the record be protected against reversible error. *(People v Cavallerio,* 71 AD2d 338, 343.)* This jury was exposed to such highly prejudicial information and on such a constant basis that it cannot be said that the court's well-intended, but futile, attempts to nullify the effect of the improprieties with its instructions in fact neutralized the prejudice to this defendant's right to a fair trial. We, therefore, reverse this conviction and remand the matter for a new trial. As to defendant's other claims, we find them to be without merit.

The judgment of the Supreme Court, Bronx County (Stanley Parness, J.), rendered January 28, 1982, convicting defendant, after a jury trial, of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of from 7 to 21 years, should be unanimously reversed, on the law and on the facts and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.

MURPHY, P. J., MILONAS, ROSENBERGER and ELLERIN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on January 28, 1982, unanimously reversed, on the law and on the facts and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.