THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER COATES, Appellant.

First Department, May 24, 1988

## APPEARANCES OF COUNSEL

*Beth J. Thomas* of counsel *(Joyce P. Adolfsen* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Edgar J. Walker* of counsel *(Levy & Walker,* attorneys), for appellant.

## OPINION OF THE COURT

Ross, J.

This appeal presents us with an issue of whether, when an accused is removed, pursuant to a court order, from his place of incarceration to a station house to appear in a lineup concerning a specific case, the right to counsel continues to attach, if thereafter, upon the basis of the same court order, he is exhibited in another lineup concerning an unrelated case, in which he has not as yet been charged. We are informed that this is an appellate issue of first impression.

On July 22, 1983, at approximately 9:30 P.M., Ms. Carmen Lopez (Ms. Lopez), Ms. Rita Rodriguez (Ms. Rodriguez), Ms. Constanza Figueroa (Ms. Figueroa), who was Ms. Rodriguez' aunt, and four small children, who were related to Ms. Rodriguez and Ms. Figueroa, all entered an elevator of an apartment building, located at 700 West 176th Street, in New York County.

As the elevator doors were closing, a young male (perpetrator), who was armed with a gun, stuck his foot inside, and held the doors open. Thereafter, this perpetrator pointed his gun at the three women, demanded their money, and informed them, if they refused to comply, he would kill the children. In response, Ms. Lopez opened her purse to indicate she had no money, and Ms. Figueroa placed her wallet into a small bag, which the perpetrator was holding. While Ms. Rodriguez tried to give her money to the perpetrator, who was standing approximately three feet away, he leveled the gun at Ms. Figueroa, and, at point blank range, shot her in the stomach.

After shooting Ms. Figueroa, the perpetrator sought to leave the building. At that time, Mr. Antonio Germosen (Mr. Germosen) was entering the building. Mr. Germosen testified that, since fluorescent lights illuminated the interior of the building, he saw the face of the perpetrator, who was running towards him. Furthermore, Mr. Germosen testified that, as the perpetrator passed him, the perpetrator looked straight at him. Shortly thereafter, Mr. Germosen became aware that Ms. Figueroa had been shot in the robbery, and, when Mr. Germosen tried to pursue the perpetrator, he shot at and missed Mr. Germosen.

In the street, Ms. Carmen and Ms. Haidee Martinez, who are sisters, heard the gunfire. While Ms. Carmen Martinez was sitting on the hood of a car in front of the building, Ms. Haidee Martinez was halfway down the block, returning to the subject building, after using a public telephone.

Ms. Carmen Martinez testified the street was bright with light, which came from a street lamp and the building.

Moments after hearing the sound of gunfire, Ms. Carmen Martinez testified she saw the profile of the perpetrator, as he ran from the building towards Broadway, followed by Mr. Germosen, and Ms. Figueroa, who was exclaiming that she had been mugged and was hurt. As soon as she heard Ms. Figueroa's statement, Ms. Carmen Martinez testified she shouted to Ms. Haidee Martinez that the perpetrator had mugged and shot Ms. Figueroa, and to call the police.

Ms. Haidee Martinez testified, in pertinent part, that, as the perpetrator proceeded towards Broadway, he ran past her, and she saw his whole face, from a distance of about three feet.

When the perpetrator reached Broadway, he turned the corner, and fled downtown.

As a result of her wound, Ms. Figueroa died the following day, July 23, 1983, in Columbia Presbyterian Hospital.

New York City Police Officer John McCormick (Officer McCormick), a 13-year veteran of the force, on July 23, 1983, was assigned to investigate the robbery and murder of Ms. Figueroa.

Between that date and August 30, 1983, when a station house lineup involving the defendant took place, Officer McCormick attempted to identify the perpetrator of the crime, who witnesses had described as being a black male in his 20's, 5-foot, 7-inches tall, weighing 140 pounds, with very short

hair, dressed entirely in black, including a black windbreaker, and wearing silver sunglasses.

Thereafter, on July 25, 1983, a police artist prepared a composite sketch, which the witnesses agreed resembled the perpetrator. However, none of the witnesses were able to identify the defendant from the photographs, which they viewed at the Police Artist's Modus Operandi Unit, or which they viewed at the 30th and 34th Police Precincts, or which they viewed at the Catch Unit, located at the 20th Police Precinct.

Subsequently, Officer McCormick spoke with New York City Police Detective Lehan (Detective Lehan), of the robbery team task force, and Detective Lehan indicated he had a suspect, who was involved in a similar robbery/homicide case. After viewing the composite sketch of the perpetrator in the Ms. Figueroa homicide, Detective Lehan informed Officer McCormick that it looked like the defendant.

Based upon Detective Lehan's possible identification, Officer McCormick prepared a photograph array folder of six individuals, including defendant, which he exhibited to witnesses. On July 27, 1983, witnesses Ms. Lopez and Mr. Germosen viewed the array separately, and, although they tentatively identified defendant as the perpetrator, they were unable to positively identify him. Since Officer McCormick had not obtained a positive identification, he decided it was not appropriate to either arrest or place defendant in a lineup at that time.

Subsequently, Officer McCormick testified that, on or about August 3, 1983, he learned defendant was incarcerated, represented by counsel, and, that Detective Lehan intended to have defendant brought, on August 30, 1983, from Rikers Island, pursuant to court order, to the 34th Police Precinct, for the purpose of being viewed in a lineup concerning an unrelated case. As soon as Officer McCormick heard about the August 30th lineup, he testified "he [Officer McCormick] said, '[w]ell, I will also have my witnesses * * * view that line up' ".

On August 30, 1983, the witnesses in the unrelated case viewed the defendant in the lineup arranged by Detective Lehan. The defendant had been brought to that lineup by court order.

When defendant became aware that he was going to be retained at the station house in order to be viewed by a different set of witnesses concerning Officer McCormick's homicide case, defendant requested of Officer McCormick that

his lawyer be notified to be present, but Officer McCormick took no action to satisfy defendant's request.

Over the course of approximately the next 12 hours, Officer McCormick, without obtaining another court order, conducted two lineups for five witnesses in the Ms. Figueroa homicide. These witnesses were Mr. Germosen, Ms. Lopez, Ms. Carmen Martinez, Ms. Haidee Martinez and Ms. Rodriguez.

Different stand-ins were used in each of Officer McCormick's lineups.

As a result of those lineups only Ms. Haidee Martinez and Ms. Rodriguez unequivocally selected the defendant as the perpetrator of the crimes that led to Ms. Figueroa's death.

Following the lineup identifications, by indictment, filed September 8, 1983, a New York County Grand Jury charged defendant with the crimes of two counts of murder in the second degree (Penal Law § 125.25), attempted murder in the second degree (Penal Law §§ 110.00, 125.25), robbery in the first degree as an armed felony (Penal Law § 160.15), robbery in the first degree (Penal Law § 160.15), and two counts of attempted robbery in the first degree as an armed felony (Penal Law §§ 110.00, 160.15).

Prior to trial, defendant moved to, *inter alia,* suppress the lineup identifications, upon the ground, *inter alia,* that he was denied counsel at the two lineups conducted by Officer McCormick. Thereafter, a *Wade (United States v Wade,* 388 US 218 [1967]) hearing was held, at which both the People and defendant presented witnesses. The hearing court held, in substance, that the defendant's right to counsel had not been violated, and that only witnesses Ms. Haidee Martinez and Ms. Rodriguez, who had positively identified defendant at the lineup, would be permitted to make an in-court identification of the defendant.

Defendant's jury trial commenced on January 23, 1984. Our examination of the trial transcript indicates that the key issue at trial was whether defendant was the perpetrator of the crime. In support of defendant's position that he was not the perpetrator, he presented an alibi defense. The jury found defendant guilty of two counts of murder in the second degree, attempted murder in the second degree, robbery in the first degree, and two counts of attempted robbery in the first degree.

On appeal the defendant contends that the hearing court erred when it held that his right to counsel did not attach to

the lineups conducted by Officer McCormick in connection with the investigation of the slaying of Ms. Figueroa. We find merit in this contention, based upon our analysis *infra.*

The Court of Appeals in *People v Blake* (35 NY2d 331, 335 [1974]) stated "Prior to *United States* v. *Wade* (388 U.S. 218), *Gilbert* v. *California* (388 U.S. 263), and *Stovall* v. *Denno* (388 U.S. 293), counsel were not required at pretrial corporeal viewings of a defendant by identification witnesses. Such viewings were considered merely stages of police investigation \* \* \* In the *Wade* and *Gilbert* cases *(supra),* however, the Supreme Court, recognizing the dangers of misidentification and improper suggestion in such viewings, mandated the presence of counsel for the accused at postindictment identifications".

Subsequent to its decisions in *United States v Wade (supra)* and *Gilbert v California (supra),* the United States Supreme Court in *Kirby v Illinois* (406 US 682, 689 [1972]) held that the rule enunciated in *Wade-Gilbert* applies to identifications occurring "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment". The *Kirby* case involved a station house identification of an accused, which took place shortly after his warrantless arrest, and before he had been formally charged in any manner.

In substance, the court in *Kirby v Illinois (supra)* redefined the *Wade-Gilbert* rule, so that a defendant's right to have counsel present at a lineup attached at a point before indictment. This conclusion is based upon the fact that, in defining the words "at or after the initiation of adversary judicial criminal proceedings" *(Kirby v Illinois, supra,* at 689), the *Kirby* court used examples such as "formal charge, preliminary hearing \* \* \* or arraignment" *(Kirby v Illinois, supra,* at 689), which are stages of the criminal process that can occur prior to indictment.

After the *Kirby* decision *(supra),* the Court of Appeals in *People v Blake (supra,* at 339-340) interpreted the words "the initiation of adversary judicial criminal proceedings", quoted *supra,* which appear in *Kirby v Illinois (supra,* at 689), to mean: "For purposes of applying the Federal rule as now restated in the *Kirby* case \* \* \* in this State a criminal action begins with the filing of an 'accusatory instrument' as defined by statute, which serves as the basis for prompt arraignment or issuance of a warrant of arrest \* \* \* It is at this point that

'adversary judicial criminal proceedings', within the meaning of the *Kirby* case, are initiated. Consequently, upon the filing of an accusatory instrument, whether or not a lawyer has been retained or assigned for general purposes, there may not be, except in exigent circumstances, a corporeal viewing of the defendant for identification purposes in the absence of counsel".

Thereafter, the Court of Appeals in *People v Coleman* (43 NY2d 222 [1977]), which was a case concerning a court order of removal of an accused, from his place of incarceration, on a specific charge, to a station house, to appear in a lineup in an unrelated case, had occasion to comment upon the effect of a court order of removal, on the concept of "the initiation of adversary judicial criminal proceedings" *(Kirby v Illinois, supra,* at 689), and the attachment of the right of counsel. In pertinent part, the court stated *(People v Coleman, supra,* at 225): "Although in *[People v Blake,* 35 NY2d 331] the commencement of adversary judicial proceedings was equated with the filing of an accusatory instrument, it has been recognized that the filing of an instrument [such as a court order of removal] other than one forming the basis of an arraignment or issuance of an arrest warrant, may nevertheless constitute a 'formal' proceeding triggering an accused's right to counsel. In *People v Sugden* (35 NY2d 453, 461), we held that a court order directing the removal of a defendant serving a sentence on an unrelated charge requiring him to visit the scene of a crime he was alleged to have committed, was 'sufficiently "judicial" in nature, not unlike arraignment or the issuance of an arrest warrant, so that a right to counsel exists at "critical stages" held after [the court order of removal] is issued' ".

Although the People acknowledge that, in view of the decision in *People v Coleman (supra)* defendant "had a right to counsel on Detective Lehan's lineup, as it was conducted pursuant to court order", they nevertheless contend defendant lost that right to counsel, when Officer McCormick, based upon that same court order, conducted his investigatory lineups in the Ms. Figueroa homicide investigation.

Our examination of the record clearly indicates that the court order of removal obtained by Detective Lehan was the only legal instrument, upon which defendant could be involuntarily retained in the station house, after Detective Lehan completed his lineup, and the People do not argue to the contrary. For example, the People admit that "Officer McCor-

mick specifically explained at the *Wade* hearing that he was not far enough along in his investigation of the Figueroa homicide to have sought a court order for a lineup in that case".

Even though *People v Coleman (supra,* at 225-227) states that a defendant can waive the right of counsel to be present at a lineup held pursuant to a court order of removal, the People do not contend that defendant, in the instant case, waived his right to counsel to be present at Officer McCormick's lineups. On the contrary, the defendant demanded counsel to be present at those lineups.

The People offer no appellate legal authority in this State which holds that, if a defendant, who is incarcerated, is subsequently taken from his place of incarceration to a station house for a lineup, pursuant to a court order of removal, and is thereafter retained at the station house, based upon the same court order of removal, for the purpose of being viewed in an investigatory lineup concerning an unrelated case, he loses the right to counsel, which previously had attached to the subject court order.

When Detective Lehan completed conducting his lineup, and Officer McCormick took over to conduct his lineups, the court order of removal, which had been obtained by Detective Lehan, we find was the only filed legal instrument that retained defendant in the station house for the subsequent lineups conducted by Officer McCormick. Moreover, our review of the record does not indicate that defendant remained in the station house voluntarily for Officer McCormick's lineups, and the People do not contend that he did.

In view of the fact that the court order of removal kept defendant in the station house, and Officer McCormick took advantage of that order for the purpose of placing defendant in two lineups, we find that order did not lose its legal effect because Officer McCormick had not originally obtained same. As mentioned *supra,* the court in *People v Coleman (supra,* at 225)* unequivocally stated that a court order of removal is a filed legal instrument, which is " 'sufficiently "judicial" in nature * * * that a right to counsel exists at "critical stages" [such as at a lineup] held after [the court order of removal] is issued' ". In other words, we find the same right to counsel that defendant had as to Detective Lehan's lineup, also applied to the lineups conducted by Officer McCormick. Since defendant was entitled to counsel at the two Officer McCor-

mick lineups, we find the hearing court erred, when it denied defendant's motion to suppress the lineup identifications.

The error involved herein is one of "constitutional magnitude" *(People v Smith,* 120 AD2d 118, 120 [1986]), since the Federal and State Constitutions guarantee an accused the right to counsel to aid in his defense (US Const 6th, 14th Amends; NY Const, art I, § 6). Therefore, this error cannot be deemed harmless "unless it can be said beyond a reasonable doubt that the error did not contribute to the conviction" *(People v Lloyd Winston G.,* 45 NY2d 962, 964 [1978]). In view of the fact that defendant's conviction depended upon his identification at trial, "the improperly admitted evidence of the pretrial lineup identification cannot be considered harmless error" *(People v Smith, supra,* at 120).

 Another contention of the defendant is that prosecutorial misconduct denied defendant a fair trial. We also find merit to that contention, since "the cumulative effect of [the prosecutorial] errors denied [defendant] a fair trial" *(People v Dowdell,* 88 AD2d 239, 240 [1st Dept 1982]).

Our examination of the record indicates the prejudicial errors of the prosecutor continued throughout the entire trial. These errors were so numerous that only some of the more flagrant are set out in detail, *infra.*

For example, the hearing court, as mentioned *supra,* held that only Ms. Haidee Martinez and Ms. Rodriguez, who had positively identified defendant at a lineup, would be permitted to make in-court identifications of the defendant. Nevertheless, during the trial, the prosecutor frequently stated to the jury that 4 witnesses instead of only 2 had identified defendant, and, on at least two occasions, the prosecutor even asserted to the jury that defendant had been identified by witnesses Mr. Germosen and Ms. Lopez, even though these witnesses had not been able to positively identify the defendant at a lineup. Although the trial court admonished the prosecutor concerning these errors, the prosecutor ignored the admonishments. In fact, the following side-Bar conference between the trial court and counsel clearly indicates how serious this problem had become during the trial:

"THE COURT: Do you have an application, Mr. Gotlin [defense counsel]?

"MR. GOTLIN: Yes, your Honor. I have moved for a mistrial during the District Attorney's summation based on his constantly referring that Miss Lopez and particularly, Mr. Germosen had made identification of the defendant * * *

"Your Honor admonished him on more than one occasion. Yet he continually did that.

"THE COURT: The Assistant District Attorney seems to have no particular interest in what I rule or what I say, nor in the value of a Wade Hearing, which we went through, to begin with, to make a determination that there would be no in-court identification.

"ASSISTANT DISTRICT ATTORNEY: Your Honor, everything that I said, in my opinion, is supported—

"THE COURT: Well, the record will show. However, at this time, I will deny the application for a mistrial, not because I don't think that you [Mr. Gotlin] may be right, and I don't believe there's very little that I can say to the Jury, although I tried, that would wipe out of their mind, some of the things that Mr. [Assistant District Attorney] said at his summation.

"But at this point, since it is summation, I'm going to allow this to go to the Jury.

"And if I was not able to correct it, *the Appellate Division will take care of it.*" (Emphasis supplied.)

Additionally, we find that the prosecutor's habit of repeating answers of witnesses in succeeding questions constituted error. The following exchange between the trial court and the prosecutor indicates that, when the trial court attempted to point out to the prosecutor that this practice constituted error, and that he should stop it, the prosecutor arrogantly rejected the offered correction:

"THE COURT: I'm telling you now, Mr. [Assistant District Attorney], the next time you repeat an answer of a witness for emphasis, I'll declare a mistrial. Is that clear? Is that clear?

"ASSISTANT DISTRICT ATTORNEY: Your Honor, this is cross-examination, no?

"THE COURT: I don't care what it is.

"ASSISTANT DISTRICT ATTORNEY" Your Honor, you'll do what you have to do. Okay?

"THE COURT: Cross-examination—

"ASSISTANT DISTRICT ATTORNEY: If he has an objection, you do what you have to do.

"THE COURT: Cross-examination consists of the questions, not repeating the answers.

"ASSISTANT DISTRICT ATTORNEY: You'll do what you have to do, Judge.

"THE COURT: Now, step up. Off the record.

"ASSISTANT DISTRICT ATTORNEY: Your Honor, I don't care to go off the record any more."

In *People v Rosa* (108 AD2d 531, 539 [1st Dept 1985], *order amended* 113 AD2d 722 [1st Dept 1985]) we unanimously stated: "Certainly, we are not required, at this late date, to set forth the duties of counsel during trial. Although we do not expect that every trial will be totally free of any error, we cannot and will not permit a conviction in a criminal trial to stand, where continuing misconduct by the prosecutor prevented a fair trial".

Since we found merit in defendant's contentions concerning the denial of his right to counsel at the lineup, and prosecutorial misconduct, and those errors require reversal, and a remand for a new trial, we do not pass upon the merits of the defendant's contention that the trial court erred in its charge.

Accordingly, the judgment of the Supreme Court, New York County (Peggy Bernheim, J., at the *Wade* hearing, trial and sentence), entered March 1, 1984, which convicted the defendant, after a jury trial, of two counts of murder in the second degree (Penal Law § 125.25), attempted murder in the second degree (Penal Law §§ 110.00, 125.25), robbery in the first degree (Penal Law § 160.15), and two counts of attempted robbery in the first degree (Penal Law §§ 110.00, 160.15), and sentenced him to concurrent indeterminate terms of from 25 years to life on the murder counts, 8⅓ to 25 years on the attempted murder count, 12½ to 25 years on the first degree robbery count, and 5 to 15 years on the attempted robbery counts, should be unanimously reversed, on the law and on the facts, judgment vacated, defendant's motion to suppress lineup identifications granted, and the matter remanded for a new trial.

KUPFERMAN, J. P., KASSAL, ROSENBERGER and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on March 1, 1984, unanimously reversed, on the law and on the facts, the judgment vacated, defendant's motion to suppress lineup identifications granted, and the matter remanded for a new trial.