THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JAMES PRESSLEY, Appellant.

First Department, July 7, 1983

APPEARANCES OF COUNSEL

*Mary Falk Horwitz* of counsel (*William E. Hellerstein,*
attorney), for appellant.

*Mark L. Freyberg* of counsel (*Billie Manning* with him on
the brief; *Mario Merola, District Attorney,* attorney), for
respondent.

OPINION OF THE COURT

MILONAS, J.

This is an appeal from a judgment of the Supreme Court,
Bronx County (RAMOS, J.), rendered August 18, 1980,
convicting defendant, after a jury trial, of manslaughter in
the first degree and sentencing him to an indeterminate
term of from 5 to 20 years. Although defendant alleges a
number of grounds in support of his contention that his
conviction was improper, only one — that relating to
prosecutorial misconduct — has sufficient merit to warrant
reversal.

On August 31, 1978 at approximately 10:00 P.M., the complaining witness, 22-year-old Michael Randolph, who was unemployed and had been convicted in 1975 of possession of a stolen car containing a gun, was sitting in the lobby of Randolph's building in the company of a friend, Elliot Cornick. Defendant and another man, both of whom Randolph had previously seen, walked past, apparently engaged in conversation. The pair disappeared toward the rear of the lobby, and Randolph heard the elevator doors opening and closing. However, a short time later, the elevator reopened, and the defendant approached Randolph and Cornick. Exclaiming that "this is what I am talking about," he extended his arms, pointed a gun at the youths and began firing in a volley which continued for about 45 seconds as Randolph and Cornick scrambled for cover. When the shooting finally ceased, Randolph and Cornick assisted each other up. They managed to make their way out of the building. Defendant was no longer anywhere in sight. Although Randolph did not yet realize that he was injured, he noticed that Cornick, who subsequently succumbed to his wounds, had collapsed. Randolph went to the nearby police precinct where he reported the incident and provided a description of the defendant. Randolph was then removed by ambulance to Lincoln Hospital, remaining there for a period of four days for treatment of five gunshot wounds.

In the meantime, two police officers had been dispatched to the scene of the shooting. Cornick's body was found in the vicinity, as well as two spent bullets and seven spent casings. A ballistics expert later testified at trial that the bullets removed from the lobby floor, along with one taken from Randolph at Lincoln Hospital, had all been fired from the same weapon. In addition, a forensic pathologist from the medical examiner's office stated that Cornick had died from gunshot wounds in the abdomen and that no powder burns were present, indicating that the deceased had been shot from a distance of more than two feet. The defendant, who became a suspect in the case in September of 1978, was not arrested until November 8, 1979, when his whereabouts finally became known to the police.

The defendant was 36 years old at the time of trial. He took the stand on his own behalf, stating that he was married, the father of four children and had been steadily employed for 10 years at the French-Polyclinic Hospital until its closing a few years earlier. After that, he was unable to obtain another job and supported his family and himself with unemployment and welfare benefits. He had never been arrested prior to the instant matter. According to the defendant, he had observed Randolph and Cornick in the area on a number of occasions. He was afraid of Cornick, a bully who preyed on neighborhood residents. At one point, Cornick had referred to the defendant as a "faggot" and, later that same day, had informed a companion that he was "going to get that guy", meaning the defendant. The defendant also mentioned a series of other unpleasant encounters which he had with Cornick prior to August 31, 1978. Then he proceeded to recount the events of the fateful night. The weather was rainy, and he and a friend, Leroy Chick, spent the evening together window shopping.and singing at a local church. Both the defendant and Chick claimed to have headed home at about 10:30 P.M. As they arrived at the defendant's building, Chick saw that the door to the elevator was opening. He hurried inside, and the elevator started up before the defendant was able to enter.

The defendant glanced around the lobby, noting the presence of Randolph and Cornick. Randolph remarked, "There go the guy." The defendant, attempting to depart the premises, moved toward the door, but Cornick and Randolph — armed with a knife and gun, respectively — prevented his exit. The defendant reached for the gun in Randolph's hand, and a struggle ensued. Although the gun thereupon began to discharge, the defendant could not remember how many shots were fired or in what direction. Finally, Randolph relinquished the gun. At this juncture, and now carrying Randolph's gun, the defendant tried to flee, Randolph and Cornick in pursuit. Defendant admitted that he shot at the two men as they chased him and that they were approximately three feet away from him, but the weapon "just went shooting" and seemed to have a volition

of its own. The defendant, retreating toward the elevator, left by the back door and disposed of the gun in a parking lot behind the building.

He returned at around 11:00 P.M. and went upstairs to his apartment. He was extremely upset and, due to his highly emotional state, had to throw up. Then he telephoned his brother and a friend, who joined the defendant and his wife in the apartment. Thereafter, the defendant, his brother and friend departed the building, observing police officers in the lobby. Although he was aware that something was wrong, he did not speak to the officers. The defendant and his two companions stopped at an aunt's house whereupon he called his wife, learning that the police were searching for him. While the defendant did not believe that he had committed a crime, he was so scared that he boarded a bus to Sumpter, South Carolina. He remained there with his parents until April of 1979 when he came back to New York. Until his arrest, he worked with a friend laying sidewalks.

Notwithstanding the fact that the evidence was certainly sufficient to support the jury's verdict of manslaughter in the first degree, the proof of guilt is not overwhelming, particularly since the crucial issue in the case involved the credibility of the defendant as opposed to that of Randolph. The defendant, a family man in his mid-thirties with a stable background and no criminal record, who had never even been arrested before, was accused of a senseless and apparently motiveless shooting. The principal witness against him was an unemployed youth in his early twenties who had previously been convicted of a crime. Although the jury, as the arbiter of credibility (*People v Williams*, 6 NY2d 18), could appropriately accept Randolph's version of what transpired on August 31 and reject the defendant's account, the improper conduct of the Assistant District Attorney prejudiced the defendant's right to a fair trial. This is especially the situation here in that the credibility of the witnesses can reasonably be considered to present a close question. Under these circumstances, the excessive zeal displayed by the prosecution was not harmless error.

Throughout the course of the trial, the Assistant District Attorney repeatedly attacked the defendant's veracity and tried to portray him as a habitual liar. He also made frequent comments on the defendant's failure to turn himself in to the authorities despite the fact that the prosecution may not impeach an individual for his prearrest silence. (*People v Conyers,* 52 NY2d 454.) A defendant is under no greater an obligation to incriminate himself by voluntarily contacting the police than he is by declining to making statements when confronted by law enforcement officials. As the Court of Appeals declared in *People v Conyers* (*supra,* at pp 458-459):

"In short, although a defendant's failure to come forward with an exculpatory version of events prior to trial may reflect negatively upon the veracity of his trial testimony, his prior silence may be attributable to a variety of innocent circumstances that are completely unrelated to the truth or falsity of his testimony. Accordingly, evidence of a defendant's pretrial silence must be regarded as having minimal probative significance and as having a correspondingly low potential for advancing the truth-finding process even when offered solely for purposes of impeachment.

"On the other hand, the risk of prejudice is substantial whenever the prosecution attempts to impeach a defendant's trial testimony by questioning him about his prior failure to come forward with an exculpatory version of events. Jurors, who are not necessarily sensitive to the wide variety of alternative explanations for a defendant's pretrial silence, may be prone to construe such silence as an admission and, as a consequence, may draw an unwarranted inference of guilt."

The District Attorney's persistent references to defendant's failure to communicate with the police and to place himself in their custody or both could have been intended only for the sole purpose of inflaming the passions of the jury so that they would summarily reject the defendant's effort to represent himself as a simple man, motivated primarily by fear and lack of sophistication, acting in self-defense. Examples of the District Attorney's line of questioning include the following:

"Ever think of taking the gun over to the police station and saying, 'Here's the gun that somebody else used against me. I defended myself with this gun.' Did you ever take that gun into the police?"

"Did you ever take that gun to the police and hand it to them and say, 'Here's the gun that man had in his hand'?"

"Did you say anything to the police at that time?"

"Did you at that time go to the back, get the gun and turn it into the police?"

"Did you tell the police 'Hey, there is a knife lying around here. You should look for it because I was attacked'?"

"In fact, up until the time you were arrested you didn't ever go to the police and tell them that you were defending yourself, did you?"

"Did you ever go into the precinct prior to your arrest and after the shooting and say to them 'you remember me, I'm the guy that was in here a little while ago complaining about somebody and now I shot that person'? Did you ever go in there and tell them that?"

"And even after you now allegedly learned later, you didn't go to the police and say this man was bullying — was a bullying man before your arrest, did you?"

The cumulative effect of the District Attorney's approach was extremely prejudicial to the accused and, in conjunction with other prosecutorial overreaching, deprived the defendant of a fair trial. (See *People v Perez,* 90 AD2d 468.) Not only did the District Attorney attack the defendant's credibility by improper use of the latter's pretrial silence, but he even resorted in cross-examination to attempting to depict the defendant as a mental defective, a welfare sponger, an alcoholic and a molester of young girls. During his summation, the District Attorney sought to convince the jury of the defendant's guilt by picturing him as totally unworthy of belief, as an inveterate liar whose entire testimony was a fabrication. The likelihood of prejudice created by the prosecutor's relentless assault on the defendant's credibility far outweighs the probative value derived from this type of evidence. (See *People v Dowdell,* 88

AD2d 239; *People v Rivera,* 75 AD2d 544.)

Judgment of the Supreme Court, Bronx County (RAMOS, J.), rendered August 18, 1980, convicting defendant, after a jury trial, of manslaughter in the first degree and sentencing him to an indeterminate term of from 5 to 20 years, should be reversed, on the law and the facts, and the indictment dismissed.

KUPFERMAN, J. P., ASCH, SILVERMAN and KASSAL, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on August 18, 1980, unanimously reversed, on the law and the facts, and indictment dismissed.