THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
  WILLIAM HICKS, Appellant.

First Department, June 12, 1984

### APPEARANCES OF COUNSEL

*Susan Hofkin Salomon* of counsel (*William E. Heller-stein*, attorney), for appellant.

*Pamela Naughton* of counsel (*Billie Manning* with her on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

MILONAS, J.

Defendant herein appeals from a judgment convicting him, following a jury trial, of assault in the second degree and sentencing him to an indeterminate term of imprisonment of from 2⅓ to 7 years. At the trial, the complainant, John Friday, testified that at approximately 11:40 A.M. on November 25, 1981, he was driving alone in his Ford Torino in the vicinity of East 187th Street and Third Avenue in The Bronx when his car was sideswiped by a dark-colored Mercury with a twisted rear fender. The two vehicles pulled over to the side of the road. The operators

exited their respective automobiles and proceeded to inspect the extent of the damage. A passenger in the Mercury remained inside. Mr. Friday and the other driver discussed the incident, but they were unable to reach agreement on what had transpired so Mr. Friday suggested that the police be called. Although the driver of the Mercury volunteered to procure a police officer, he instead walked back to his automobile, engaged in a brief conversation with his companion and then returned to Mr. Friday. Upon reaching Mr. Friday, who was sitting in his car, the driver of the Mercury drew a gun and shot Friday in his left leg, demanding money. Before Mr. Friday had a chance to respond, the assailant fired again, this time hitting the complainant in his right knee.

Mr. Friday, in pain and fearing for his life, first directed the assailant to his glove compartment before finally removing $214 from his back pocket and handing the money to him. The passenger in the Mercury had left the vehicle, and, at this point, the assailant attempted to force the complainant into the Mercury. However, Mr. Friday pushed the assailant against his companion and managed to limp across Third Avenue. Within a block, the assailant caught up to him. Mr. Friday struggled with him until, at his friend's urging, the assailant returned to his car, and the two men drove off. The complainant thereupon stumbled to a nearby garage where Police Officer Daniel De Pagnier, on duty in the general area, found him in a state of collapse. According to the officer, the complainant, who was in shock, very agitated and, in addition, suffers from a speech impediment, could only furnish incomplete and confused details regarding the incident in question. At any rate, the evidence does indicate a possible inconsistency between Mr. Friday's original description of the assailant and the version which he ultimately provided to the police and in court. This discrepancy primarily involves the assailant's age. The defense took every opportunity to point out that Officer De Pagnier had noted in his report that the assailant was a black male approximately 20 years of age, whereas the complainant later asserted that the man who shot him was in his late 30's. (The defendant was, at the time of his trial, almost 40 years old.) The defendant's

attorney also referred to Mr. Friday's failure to supply Officer De Pagnier with a more precise description of his assailant, particularly in view of the complainant's subsequent ability to recall further details. Thus, the defense made much of the complainant's initial silence concerning the assailant's height, weight, hair color and facial hair, as well the fact that he omitted to take down the license plate of the other vehicle.

Mr. Friday was brought to St. Barnabus Hospital where he was operated on for his gunshot wounds, and a .38 caliber bullet was removed from one knee. During his stay in the hospital, he was interviewed by Police Officer Richard Robinson. Officer Robinson testified that because of the complainant's speech impediment and condition (he was apparently in considerable pain and under medication), he did not elicit much information. Officer Robinson did state, however, that Mr. Friday had advised him that the assailant's car was green and gold, a description which conflicted with that given to Officer De Pagnier (a black over blue Mercury) and also with the vehicle which the defendant was later observed to be driving.

On December 31, 1981, some five weeks following the attack on him, Mr. Friday, in the company of his girlfriend, was in his automobile heading eastbound on East Tremont Avenue when he noticed the defendant's automobile parked near a McDonald's restaurant. After examining the vehicle, he proceeded to the 48th Precinct and related his story to the police. Two officers then escorted the complainant back to the scene in an unmarked car. Since the defendant's vehicle was no longer in the same location, they cruised the neighborhood in search of it. Within a matter of minutes, the automobile, a dark Mercury with a twisted rear fender, was spotted double-parked on Tremont Avenue. The vehicle being unoccupied, the police officers stopped their own car and awaited the operator's return. Shortly thereafter, Mr. Friday exclaimed, "There goes the man", and pointed to the defendant as he walked down the street. The complainant was asked several times by the officers if he was certain that the defendant was his assailant, and he responded unequivocally in the affirmative. The defendant was then placed under arrest. Currency in

the amount of $257 was found in his possession, and it was later determined that he was the owner of the vehicle.

The defendant took the stand in his own behalf. Pursuant to a pretrial ruling by the court, he could only be questioned about a 1973 conviction for petit larceny which resulted in a fine. The defendant denied responsibility for the assault and robbery of the complainant, but he could not specifically remember what he was doing on November 25, 1981. He claimed that on December 31, 1981, the day of his arrest, he had encountered a friend of his wife's (the woman who was with him when he was arrested) and that he agreed to give her a lift. He also stated that he was on his way to purchase liquor for a New Year's Eve party.

While the proof introduced at trial was certainly sufficient to support the jury's verdict, the evidence of guilt was hardly overwhelming since the crucial issue involved the accuracy of the complainant's identification of the defendant as the perpetrator. In that connection, it is evident that the jury did not reach its verdict without difficulty. Deliberations commenced on June 29, 1982 at 12:35 P.M. Approximately four hours later, the jury declared that it was deadlocked. Following a modified *Allen* charge and reinstruction by the court on the elements of the offenses charged, deliberations resumed, continuing until nearly 10:00 P.M. The jury then announced an apparent compromise verdict: acquittal of the robbery and weapon counts; conviction of assault in the second degree. Although the jury, as the arbiter of credibility (*People v Williams*, 6 NY2d 18), could appropriately accept Mr. Friday's account, as well as his identification of the defendant, and resolve any contradictions in the evidence in favor of the People, the improper conduct of the Assistant District Attorney severely undermined the accused's right to a fair trial. Under these circumstances, the excessive zeal displayed by the prosecutor cannot be deemed to constitute harmless error. (*People v Pressley*, 93 AD2d 665.) The misconduct involved here occurred, for the most part, throughout the Assistant District Attorney's cross-examination of the defendant and in his summation to the jury.

Although the issue was never raised in the defendant's direct testimony, the prosecutor began his cross-examina-

tion with a long series of inquiries regarding the defendant's employment history. The defendant asserted that he worked on construction jobs obtained through the A&M Coalition on Bruckner Boulevard, but that he had not worked during the last two weeks of November of 1981. The prosecutor continued to delve deeper into what seemed to be a largely sporadic employment history, even going so far as to ask the defendant what he had been doing back in 1972, 1973 and 1974. When the Assistant District Attorney questioned the defendant about prior jobs which he had held, the defendant replied that he had worked as a therapist for retarded children. The following exchange then took place:

"Q. And what are your qualifications to perform therapy on retarded children?

"A. It's on the job training.

"Q. They trusted you with retarded children?"

Defense counsel's objection was overruled, but the prosecutor did not insist on an answer. Instead, he elicited the information that the defendant had remained on this job from 1973 until the end of 1974 when he had been laid off for financial reasons. Despite being pressed to explain precisely the months or seasons that he had worked in 1973, the defendant was unable to do so. The District Attorney then asked the defendant: "Can you tell me a little more about that previous conviction?" The defendant responded that he had pleaded guilty to petit larceny.

"Q. And when was that?

"A. I believe it was —

"Q. Don't you know?

"A. No, I can't recall exactly. No, I know it was in '70 — I believe it was, '72, I believe.

"Q. Would it surprise you that that was the time that you said you were working?"

The prosecutor reverted to further inquiry into the length of time that the defendant had worked with retarded children. Dissatisfied with the defendant's response that he was hurt on the job and couldn't recall, the District Attorney on three separate occasions advised the defen-

dant to "think about it." After some more questions concerning the defendant's job-related injury and additional requests for greater specificity as to dates, the prosecutor next probed into whether, and in what manner, the defendant supported his children and estranged wife. When the defendant declared that he supported them by working, the District Attorney, in an attempt to discredit the witness, proceeded to display a sheet prepared by the Pre-Trial Services Agency and read from it notwithstanding the fact that this report had never been admitted into evidence and was, moreover, being utilized here simply for the purpose of impeaching the defendant's credibility. Indeed, the District Attorney relied on the Pre-Trial Services Agency sheet to demonstrate that the defendant, despite his claims to the contrary, was not supporting anyone.

Moving on to another line of questioning, the prosecutor, despite the court's refusal to allow inquiry into a prior misdemeanor conviction which the defendant had for possession of drugs (his only drug-related conviction), asked the defendant if he took drugs. After being informed that the defendant was on methadone at the time of his arrest, the District Attorney demanded, "And did they have you on any methadone in jail?", thereby undermining at one stroke the precautions which had been taken to ensure that the jury was kept in ignorance of the defendant's incarceration. Out of the presence of the jury, the court expressed its annoyance with the prosecutor, who apologized, stating that his question had been "a slip of the tongue" and that he would be more careful in the future. The court then denied the defense motion for a mistrial and endeavored to remedy the situation by providing curative instructions to the jury. The District Attorney, not content to let the matter rest, asked the defendant, who had previously stated that he was unable to recall what he did on Thanksgiving (the day after the shooting), whether he was high on drugs that day. The court sustained the defense's objection, cautioning the prosecutor, "Let us not talk about drugs anymore." The District Attorney returned to the matter of the defendant's actions on Thanksgiving, as well as the day before Thanksgiving. The defendant again insisted that while he knew that he hadn't robbed or

shot anyone, there was nothing about either day that stuck out in his mind. The District Attorney continued to badger the defendant on the subject, finally inquiring, "Why is your memory so bad on a day when you were indicted for seven counts of felonies?" The court sustained the defense attorney's objection, but the District Attorney nevertheless commented, "Did you think about it?" The court also ordered that stricken.

The prosecutor next attempted to ascertain if anybody other than the defendant could have been driving his car on the day of the incident. The defendant had no memory of lending his vehicle, and, after belaboring this point, the District Attorney went on to pose a series of questions, many of them clearly improper, concerning the defendant's general familiarity with guns. Then he turned his attention to the $257 which the defendant was carrying at the time of his arrest. Despite the fact that the prosecutor never made an offer of proof or otherwise tried to connect the money to that taken from the complainant, he demanded that the defendant account for the funds. Not satisfied with the response that the money had been obtained by hitting a number and winning in a crap game, the District Attorney persisted, finally declaring, "Isn't it true you were on your way to go buy cocaine?" The court sustained the defense's objection, and counsel approached the Bench. The prosecutor for the first time proposed to make an offer of proof — that the defendant's female companion at the time of the arrest had admitted to the police that the pair were en route to purchase cocaine and that if the defendant denied this, he [the District Attorney] intended to call either the woman or the arresting officer as a rebuttal witness. The defendant's lawyer protested, asserting that the woman's admissions had nothing to do with the defendant, that her statements were hearsay as to him and that, further, the prosecutor had, throughout his cross-examination, tried to depict the defendant as a user or seller of drugs, neither of which were at all related to the instant charges. Although the court denied the motion for a mistrial, it warned the prosecutor that he had been "skating on very thin ice now for the last two hours". The District Attorney endeavored without success to persuade

the court to permit him to pursue this line of questioning, but the court ultimately requested that he halt his cross-examination and again cautioned the jury to disregard all questions and answers regarding methadone and drugs.

The District Attorney's summation was equally reprehensible. It included, but was not limited to, the following improper remarks:

"Your Honor, Mr. Clarke, Madam Forelady, ladies and gentlemen of the jury, good morning. We've just heard a rousing summation by my adversary, Mr. Clarke. Good summation. Just remember, he's got a job to do, I've got a job to do —

"MR. CLARKE [defense attorney]: Objection, Your Honor.

"A.D.A.: Your Honor has a job to do and you have a job to do * * *.

"Mr. Clarke makes a very big ado about two police reports that contain certain inconsistencies. There's nothing I can do about that. This is the report in black and white. Just let me say this one thing to you or two things, ladies and gentlemen, with respect to each report. First of all, did Mr. Friday — did Mr. Friday have an opportunity to look at the report, peruse it and say, yes, this is right, no, this is wrong? No ladies and gentlemen, that's one thing.

"All the reports he enters into a box here for information to check off your initials to prove it by the complaining witness.

"MR. CLARKE: Objection.

"A.D.A.: We've got two reports here, one taken minutes after the incident and the other taken a few hours later at the hospital. Police trying to do their own jobs go and take the report. Mr. Clarke says and Mr. Friday said this and he said that. I dare say, ladies and gentlemen, that when the man was lying on the sidewalk with the officer trying to get a statement from him, that what little Mr. Friday said, if, if he's understood, if it was understood was very little, inferring the man was in no condition to give a statement. Just think about it for a second. Just think about it for one second. You're on Third Avenue, on the ground, this incredible incident just occurred to you. What would you say? I'm not sure that he said that, ladies and gentlemen, like I

say, there's no box here for the initials of the complaining witness to okay it. * * *

"Talk about that man over there, the prosecutor gets a case. There's only so much I can do. I work with what I have got, right? An interesting aspect about this case is Mr. Clarke got out of his voir dire very astutely his client is not going to testify. How many times did he say that? It's all right, he doesn't have to testify. Everybody knows that but he did testify. Now, I can comment on his testimony. First of all, he said he wasn't going to testify. Why did he change his mind all of a sudden? * * *

"If the guy says he's not going to testify and then all of a sudden he testifies, so, that's like an unknown variable in the case but I dare say, ladies and gentlemen, by virtue of the fact that he testified, he took the stand, he really did shut the nail on his own coffin. Think about his defense, now, this is the defense, this is the great defense. Thirty-six days ago I don't know what happened because I wasn't working and it was just like a day like any other day. That's my defense, ladies and gentlemen. * * *

"Who is he trying to kid? Are we back in second grade? I forgot, I forgot 36 days ago. I forgot what I was doing the day before, Thanksgiving. Who is he trying to kid? He's trying to kid you. Just think about it for a second here; is a man who's been indicted on a seven count indictment * * *

"Here is a man who says I can't remember what I was doing 36 days ago. Do you buy that? Look long and hard in your conscience, ladies and gentlemen, do you buy that for a second? Mr. Clarke says he's got to be telling the truth because look how honest his answer is, he didn't know. Look how stupid this defense is, it's got to be the truth. The swiftness or lack of swiftness of his client's story is not my doing, it's his doing. If you want to believe that, ladies and gentlemen, go on and believe it. However, there's more to it than that. * * *

"Why dare say, ladies and gentlemen, that taking us back in time, now, to a reasonable point of time when the scenario was played that Mr. Friday knows enough about our system of law and the criminal justice system to sit down and say I really got to come up with a good story to

impress the jury, I really got to think hard that this happened, he says, to impress you.

"He's not going to sit down and start thinking about things like that. He's telling you the truth, ladies and gentlemen. I hope you could see through the defense's covering up * * *

"Mr. Clarke is accusing me of some sort of racism when I said he was with a white woman. What's the big deal? Mr. Clarke has planted that in your minds. If you want to believe that about me I don't care because this is not a personality thing, it has nothing to do with the case. But, again, here comes the veil, the transparent veil. Don't be fooled by this transparent veil, see beyond that, the key, ladies and gentlemen, is Mr. Friday's testimony and I think you've all seen him, you can all judge his demeanor as opposed to the demeanor of the defendant. Do you know what I call this defense? If you remember 36 days ago, it's called a lame defense, very lame and so lame that Mr. Clarke says it's got to be true. Here comes the veil again."

In an effort to undermine the defendant's contention that he was not the person who attacked and robbed Mr. Friday, the District Attorney resorted to portraying the defendant as an individual lacking a steady means of employment; a drug user and, possibly, a drug dealer; as someone who shirks his responsibilities by neglecting to support his wife and children; and a habitual liar and, therefore, generally unworthy of belief. The prosecutor's cross-examination, virtually without exception, was directed at maligning the defendant's character rather than at the offenses of which he was accused. The law is clear that persistent questioning of a defendant on collateral matters which tends to impugn his character without being probative of the crime charged constitutes improper and prejudicial cross-examination. (*People v Pressley, supra; People v Perez,* 90 AD2d 468; *People v Bolden,* 82 AD2d 757.) In that connection, the District Attorney's use of extrinsic evidence, the Pre-Trial Services Agency sheet, was highly improper. (See *People v Orse,* 91 AD2d 1003.) As the Court of Appeals reiterated in *People v Schwartzman* (24 NY2d 241, 245, cert den 396 US 846) "a cross-examiner cannot *contradict* a witness' answers concerning collateral matters by producing extrinsic

evidence for the *sole purpose* of impeaching credibility."
Also improper was the District Attorney's attempt to suggest that the defendant's poor employment history, as well as his possession of $257, was evidence of his proclivity for criminal activity. (See *People v Wright,* 41 NY2d 172; *People v Symbato,* 72 AD2d 780.) In addition, the prosecutor's entire cross-examination was conducted in a sarcastic, repetitive manner which could only have been intended to convey to the jury his own ill-concealed contempt for the defendant.

Although a defendant who elects to testify on his own behalf may be cross-examined with respect to immoral, vicious or criminal acts which have a bearing on his credibility, such questioning is impermissible when its purpose is to show a propensity to commit the offense for which the defendant is being tried. (*People v Wright,* 41 NY2d 172, *supra.*) The effect of the prosecutor's frequent inquiries relating to the defendant's involvement with drugs could only be to induce the jurors to equate the use of drugs with a propensity for criminal conduct. (*People v Dowdell,* 88 AD2d 239; see, also, *People v Estrada,* 83 AD2d 564.) Similarly, evidence of uncharged crimes introduced to demonstrate that the defendant is of a criminal disposition and, therefore, likely to have committed the crimes of which he is now accused is inadmissible. (*People v Ventimiglia,* 52 NY2d 350; *People v Rivera,* 88 AD2d 892.) Also lacking in any probative value, but certainly prejudicial, was the District Attorney's "slip of the tongue", since it acquainted the jury with the fact of defendant's pretrial incarceration.

As for the prosecutor's summation, by both ridiculing and attacking the defendant's credibility and the sincerity of his attorney, as well as vouching for the credibility of the People's witnesses, the District Attorney "exceeded the bounds of legitimate advocacy". (*People v Shanis,* 36 NY2d 697, 699; see, also, *People v Bolden, supra.*) Indeed, whatever semblance of a fair trial remained after the prosecutor had completed cross-examining the defendant was terminally laid to rest by his summation. The defendant's reasons for having "changed his mind" about testifying was simply not an appropriate matter for speculation by the

District Attorney. In effect, the District Attorney was urging the jury to draw a negative inference from the defendant's decision to exercise his constitutional right to present a defense. Among his catalogue of improprieties, the prosecutor characterized the defense's position as "stupid", "covering up", "a veil that he's trying to put over", and insulting to the jury ("Who is he trying to kid? Are we back in second grade?") Except to arouse the prejudice of the jury, there can be no valid purpose for such inflammatory language.

Since the cumulative effect of the District Attorney's misconduct was to deprive the defendant of a fair trial, he is entitled to a new trial. (See *People v Alicea,* 37 NY2d 601; *People v Bolden, supra.*)

Consequently, the judgment of the Supreme Court, Bronx County (Joseph DiFede, J.), rendered on July 30, 1982, convicting the defendant, following a jury trial, of assault in the second degree and sentencing him to an indeterminate term of imprisonment of from 2⅓ to 7 years, should be reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.

MURPHY, P. J., KUPFERMAN, CARRO and ALEXANDER, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on July 30, 1982, unanimously reversed, on the law and as a matter of discretion in the interest of justice, and the matter remanded for a new trial.