THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOUIS
RIVERA, Appellant.

First Department, May 1, 1986

## APPEARANCES OF COUNSEL

*Andrea Hirsch* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Lisa E. Sarnoff* of counsel *(Roger L. Stavis* with her on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

MILONAS, J.

On August 11, 1983, undercover officer Zuma Zelma Moreno proceeded to a private residence at 871 East 162nd Street in The Bronx which she knew was occupied by one Juan Villanueva, the target of a police investigation. There she met Villanueva, his wife Rosa Slater and another man, introduced as "Louie", who was later identified as defendant herein. The officer negotiated with the two men over the price of some 30 glassine envelopes of heroin. The sale was eventually made with prerecorded buy money, and Officer Moreno returned to the precinct where the narcotics was vouchered and sealed. In filling out the police report concerning the transaction, she described the defendant as a clean-shaven, balding male Hispanic in his mid-40's with black hair, weighing 160 pounds and five feet eight inches in height. At trial, the officer recalled that defendant had a limp, but she neglected to include that information in her report.

The following week, on August 18, 1983, Officer Moreno returned to the same location and purchased 70 glassine envelopes of heroin from Villanueva and defendant. She thereafter transmitted a description of defendant to her backup team which was similar to the one provided on the previous occasion. The drugs were then vouchered. More than five months later, on January 25, 1984, police officers executed a search warrant at the Villanueva home and recovered some of the prerecorded buy money, as well as additional quantities of narcotics. Villanueva was thereupon placed under arrest. When defendant arrived at the house, he told the police that he was Villanueva's brother-in-law and lived upstairs. He, too, was arrested. Subsequently, he was identified by Officer Moreno as the other participant in the drug sale of August 11 and August 18, 1983.

At the trial held in connection with this matter, defendant called two of his friends, who were both residents of the same building. They asserted that defendant had worn a mustache

since 1982. Defendant's 10-year-old son also testified that defendant had always had a mustache. Thus, it was defendant's contention that he had not been involved in the narcotics transactions in question, that he was the victim of misidentification and that his appearance differed significantly in several respects from that of the individual described by Officer Moreno. In summation, defense counsel stressed the alleged discrepancy. He noted that the seller was five feet eight inches tall whereas defendant was only five feet three. He also pointed to the statements of the witnesses who claimed that in August of 1983 defendant had a mustache and was, therefore, not clean shaven. Defendant's attorney further insisted that Officer Moreno would have observed his client's pronounced limp and recorded it in her police report had the seller possessed such an infirmity.

The jury began their deliberations before lunch and continued their consideration of the case until 9:30 P.M. that evening. They finally reached a decision the following day. During their deliberations, the jury requested to see the arrest report, which had not been entered into evidence, and asked that certain testimony be read back to them. It is, consequently, evident that the jury experienced some difficulty in rendering their verdict. While it is certainly true that the jury, as the arbiter of credibility (People v Williams, 6 NY2d 18; People v Hicks, 102 AD2d 173), could appropriately believe the account offered by the prosecution and reject that of defendant, the District Attorney's summation was so inflammatory as to deprive the defendant of his right to a fair trial. Among the improprieties committed by the prosecutor was an attack upon the defendant's decision to go to trial. According to the District Attorney: "It is Officer Moreno's job to remember things, to remember features and faces, that is true, and maybe she was this much off on the description of this man's height, you know, she was two inches off on Juan Villanueva and 10 pounds off. Evidently that was not enough for Juan Villanueva to fight it because he pled guilty, that was brought out. But because we have this much of a difference, you know, we are here trying the case."

The prosecutor, it is clear, impermissibly denigrated the fact that defendant elected to avail himself of his due process right to a trial and, unlike his codefendant, did not plead guilty. The District Attorney, by his remarks, also implied that Villanueva's guilty plea was suggestive of defendant's guilt. Yet, the Court of Appeals has held that while "a codefendant's

plea of guilt might be admissible on the question of credibility if the codefendant takes the stand in defendant's trial, that plea has no probative value as to defendant's guilt." *(People v Wright,* 41 NY2d 172, 176.) The foregoing statement was improper in another respect as well: the prosecutor inappropriately speculated on the reasons why Villanueva chose to plead guilty and why defendant went to trial. The District Attorney, moreover, appeared to criticize the defendant for not testifying on his own behalf when he told the jury that "you certainly don't know by any positive proof by the defendant in this case that he had a mustache on August 11th and August the 18th of 1983."

In addition to deprecating defendant for exercising his constitutional rights, the District Attorney included defense counsel as a target for disparagement. In that regard, he accused defendant's attorney of providing Manuel Oquendo, a defense witness, with the responses to his questions. The prosecutor demanded rhetorically: "And did you hear the type of questions Mr. Furst was asking Manuel Oquendo, it was as if Mr. Furst was testifying up there, we had the answer built into it. And that's because he had to tell the guy the day before you are going to be testifying, these are the questions I am going to be asking you and these are the answers. Wasn't that apparent from the testimony you got from Manuel Oquendo?"

By intimating that defendant's lawyer engaged in unethical conduct by coaching his witness to testifying untruthfully, the prosecutor not only impugned counsel's integrity, something which he is not permitted to do *(see, People v Ortiz,* 116 AD2d 531; *People v Hicks, supra; People v Vera,* 94 AD2d 728; *People v Blackman,* 88 AD2d 620), but he inferred that defense counsel was himself not convinced of his client's innocence. After all, the prosecutor appeared to urge, defendant's attorney would not have had to resort to such tactics if he believed defendant to be not guilty. Another highly improper comment on the part of the District Attorney was the following:

"The last thing about Jose Louis Rivera [defendant's son], it's a Catch 22 theory, ladies and gentlemen. You got a boy 10 years old living at 871 East 162nd Street where you already know seven drug sales took place to undercover police officers, where you already know that three and a half ounces of heroin was sold and 11 ounces of cocaine were sold, where you already know that in August of 1983 there is no grammar

school for 10 year olds in Bronx County, where you already know that on other occasions the boy was seen in the house when undercover police officers were also there. Which calls to mind something that a French philosopher from the late 1700's early 1800's, his name was Jean [Rousseau] had a theory about people, about whether they were good or bad and how they became good or bad, and his theory was this: that all people, all children, are born basically good, that the genes that they have do not determine whether they will be evil people or bad people or good people or great people. It is the environment that they grow up in and that they live in that determine what they become. So think about that if you want to consider sympathy in this case for Louis Rivera or for Louis Rivera, Junior.

"Mr. Furst: Objection, your Honor.

"The Court: Overruled.

"[District Attorney]: What kind of sympathy will you be showing this boy by returning him to that same environment from which he comes from?"

Regardless of defendant's motivation in calling his 10-year-old son as a witness, the prosecutor's conjecture that defendant was exploiting his child solely for the purpose of gaining the sympathy of the jury was extremely prejudicial, as was the District Attorney's reference to seven drug sales (defendant was only charged with two) and the unfortunate environment in which defendant was presumably raising his son and to which the boy would be returned if defendant were allowed to go unpunished. Such a flagrantly inflammatory statement was calculated to appeal to the jury's concern for the well-being of a young child by asking the jury to convict defendant in order to protect his son. The prosecutor's conduct was, moreover, particularly harmful in view of the court's overruling of defense counsel's objections. *(See, People v Defense,* 51 AD2d 924; *People v Range,* 49 AD2d 832; *People v Clemons,* 48 AD2d 802, wherein this court has previously condemned prosecutorial attempts to inject sympathy for others into criminal proceedings.)

Finally, the District Attorney wrongfully vouched for the strength of the People's case by asserting that the prosecution had more than met its burden of proof. *(People v Rogers,* 59 AD2d 916; *see also, People v Rosado,* 43 AD2d 916.) At the same time, the prosecutor characterized a trial as "a search for the truth", thereby proposing that the jury might convict

even in the absence of proof beyond a reasonable doubt as long as the jury concluded that its verdict represented the truth. *(See, People v Sepulveda,* 105 AD2d 854.) As this court recently determined in *People v Ortiz (supra,* p 534), "[g]iven the credibility issue, it cannot be concluded that the evidence of guilt was overwhelming and a conviction assured in the absence of these rampant episodes of prosecutorial misconduct." Since the cumulative impact of the aforementioned errors was to prejudice defendant's right to a fair trial, he is entitled to a new trial.

Therefore, the judgment of the Supreme Court, Bronx County (John N. Byrne, J.), rendered on August 3, 1984, convicting defendant, following a jury trial, of two counts of criminal sale of a controlled substance in the third degree and sentencing him, as a second felony offender, to two concurrent indeterminate terms of imprisonment of from 4½ to 9 years, should be reversed, on the law, and the matter remanded for a new trial.

MURPHY, P. J., KUPFERMAN, ROSS and ELLERIN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on August 3, 1984, unanimously reversed, on the law, the judgment vacated, and the matter remanded for a new trial.