214 N.J. Super. 108 (1986)
518 A.2d 518
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS MEROLA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1986.
Decided December 1, 1986.
*110 Before Judges PRESSLER, GAULKIN and BAIME.
Philip De Vencentes argued the cause for appellant (Galantucci & Patuto, attorneys; Philip De Vencentes, on the brief).
Greta-Ann Gooden, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Greta-Ann Gooden, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The novel question presented by this appeal is whether a defendant's prearrest failure to provide the police with information which, although exculpatory with regard to the crime charged, would incriminate him as to another offense, can be used to attack his credibility at trial. We hold that a defendant is under no obligation to volunteer such information to the police and, therefore, the State should not be permitted to attack his credibility on that account.
Following a protracted jury trial, defendant was convicted of murder (N.J.S.A. 2C:11-3a(1), (2)), armed robbery (N.J.S.A. 2C:15-1) and two counts of aggravated assault (N.J.S.A. 2C:12-1b(1). On the murder conviction, defendant was sentenced to a custodial term of 30 years. Pursuant to N.J.S.A. 2C:11-3b, the entire sentence is to be served without parole eligibility. Concurrent sentences were imposed on the other charges.
In the early morning hours of November 24, 1983 Omar Muhammed was shot and killed and Michael Bambo was wounded during the course of a heated dispute concerning a drug transaction. The State's theory at trial was that defendant shot both men when they refused to permit him to sample a quantity of cocaine he was about to purchase. The defense *111 contended that Muhammed and Bambo accidently shot each other while they were attempting to rob the defendant.
The record discloses the following salient facts. In the evening of November 23, 1983 defendant, Joseph Deleva, Terri Giannetta and Dominie Buda were having drinks at the Finnish Line, a tavern located in Newark, when they decided to purchase some cocaine. The group proceeded to an address located on Fifth Street and Bloomfield Avenue where Deleva attempted to buy the drugs from an acquaintance, Bryon Robinson. Although Robinson did not have any cocaine in his possession, Bambo, who apparently overheard the conversation, suggested that they could purchase the drugs from him. After brief negotiations, it was agreed that the group would follow Bambo to his apartment in Nutley.
Bambo and Robinson then met Muhammed and drove off in Muhammed's automobile. During the ride, Bambo confided to Robinson that he intended to "beat [those] white guys" by selling them something other than cocaine. Bambo agreed to pay the other two men $40 each and "some beer and wine" in return for their assistance.
Defendant, Deleva, Giannetta and Buda followed in Buda's automobile. En route to Bambo's apartment, Buda became increasingly alarmed because it appeared that Muhammed was driving in circles. When they finally arrived at the parking lot adjacent to Bambo's apartment building, Buda, because of her concern, parked her automobile facing the exit approximately 27 feet from Muhammed's vehicle. Defendant then accompanied Robinson, Muhammed and Bambo into the building. While in the apartment, Bambo obtained a tinfoil apparently containing cocaine.[1]
*112 The men then returned to the parking lot. At that point, an argument developed because defendant refused to pay for the cocaine without first sampling it. Deleva and Giannetta observed Muhammed "unzip his jacket" and reach across his chest in a manner which caused them to fear he was in possession of a firearm. Deleva urged defendant to return to the car. Defendant refused, however, and proceeded to the driver's side of Muhammed's automobile.
It is at this point that the State's and the defense's version of what transpired differs markedly. According to the State's witnesses, Muhammed was seated in the driver's seat with the door open when defendant approached. The window on the driver's side was also open. Robinson testified that as Muhammed leaned across the seat to unlock the door on the passenger's side, defendant reached in the driver's window and shot the deceased in the chest. After hearing the shot, Robinson attempted to escape, but was confronted by defendant who pointed the gun at him and demanded the cocaine. Robinson told defendant that he didn't have the drugs and emptied the contents of his pockets. When defendant bent down, Robinson ran off.
Bambo testified that Buda drove out of the parking lot when the shots were fired. At that point, defendant, who was apparently still chasing Robinson came upon Bambo and, without warning, shot him in the shoulder. Bambo and Robinson then ran toward a police patrol car that was approaching the parking lot. The two men frantically told the officer about the shootings. Bambo was immediately taken to the hospital for treatment of his wounds.
The accounts of Robinson and Bambo were corroborated by the testimony of several residents of the apartment complex. Although they were unable to positively identify defendant as the perpetrator of the shootings, their descriptions of the fast-moving events confirmed the version of Robinson and Bambo in several particulars. In addition, Michael Liscari, a visitor who *113 observed the incident from the window of a fourth floor apartment, testified that, as the police officer's patrol car pulled into the parking lot, his attention was diverted to a man, resembling defendant, leaning into Muhammed's automobile apparently searching for something. When he finished, the man wiped the car door, the steering wheel and the dashboard with his sleeve and fled into the adjacent field.
Defendant elected to testify. As we have noted, his account of the events immediately prior to the killing generally mirrored the evidence presented by the State. He denied, however, shooting Muhammed and Bambo. According to his testimony, a heated argument developed between him and Muhammed upon returning to the parking lot after Bambo had obtained the cocaine. He testified that as he was reaching into his pocket in order to pay for the drugs he was suddenly "struck twice in the face with a hard object." Muhammed stood on one side of him and Bambo on the other. Both men brandished handguns. As he heard shots being fired, defendant struck Muhammed in the mouth and escaped.
Defendant testified that he was cut and bleeding from the attack by Muhammed and Bambo. In a dazed condition, defendant fled into the nearby streets where he was ultimately found by Deleva and Giannetta who, along with another friend, had returned to look for him. Deleva accompanied defendant to his apartment where they stayed that night.
Defendant testified that upon entering his apartment he immediately took off his bloody clothing and set it afire. Defendant then flushed the remnants down the toilet. A piece of charred remains was eventually discovered by defendant's landlord and was given to the police. Defendant's explanation for attempting to destroy his clothing was thoroughly elicited during his direct examination and repeated during his cross-examination. Defendant testified that he had been convicted previously of distributing controlled dangerous substances and uttering a forged instrument and was on probation at the time of *114 the incident. According to defendant, he feared that disclosure of his attempt to purchase cocaine would result in revocation of his probation and imprisonment. Moreover, defendant testified that he did not know Muhammed and Bambo had been shot. According to his testimony, he first learned of Muhammed's death while reading a local newspaper several days later at which time he retained an attorney and surrendered. Defendant admitted, however, that on the day after the incident he had his sister take photographs depicting his wounds.
It is against this factual backdrop that the prosecutor questioned defendant concerning his failure to initially contact the police concerning the attempt of Muhammed and Bambo to rob him. Defendant admitted that he never volunteered this exculpatory information to the police and that he never filed a criminal complaint against Bambo. Defense counsel did not initially interpose an objection to this testimony. He subsequently requested a sidebar conference, however, and objected on the basis that defendant had no duty to provide the police with any information once he was a "target" of their investigation. The trial judge agreed with defense counsel's argument and instructed the jury that a suspect sought by the authorities in connection with an offense "has no obligation whatsoever to come forward" with the exculpatory facts he later gives in his trial testimony. The judge went on to note, however, that the jury could consider defendant's silence prior to the time "he became a subject of [a] criminal investigation." Defense counsel offered no objection to the trial judge's curative charge.
It is now argued, however, that the prosecutor's questions concerning prearrest silence infringed upon defendant's Fifth Amendment privilege. Defendant alternatively contends that New Jersey's common law privilege against self-incrimination accords greater protection than its federal constitutional counterpart and that it should be interpreted as precluding the State from eliciting testimony concerning an accused's prearrest failure to apprise the authorities of the exculpatory information he later provides in his trial testimony.

*115 I
The extent to which a defendant's silence can be used to impeach his trial testimony has been the subject of several recent decisions by the United States Supreme Court. In Doyle v. Ohio, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91, 97 (1976), the Court held that silence in the wake of the warnings mandated by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) is "insolubly ambiguous" because it may be nothing more than the arrestee's exercise of his privilege against self-incrimination. Although the Miranda warnings themselves contain "no express assurance that silence will carry no penalty," the Court concluded that "it would be fundamentally unfair and a deprivation of due process" to allow the arrested persons's refusal to respond to questions to be used to impeach an explanation subsequently offered at trial.[2] 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d at 98.
In Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court addressed the question whether the use of prearrest silence to impeach a defendant's credibility violates either the Fifth or the Fourteenth Amendment. The Court stated that when a defendant elects to take the stand and testify, he necessarily "cast[s] aside his cloak of silence" and subjects himself to cross-examination. Id. at 238, 100 S.Ct. at 2129, 65 L.Ed.2d at 94. Having voluntarily chosen to take the stand, the accused is under "an obligation to speak truthfully and accurately." Ibid. quoting Harris v. New York, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971). The Court observed that while every defendant has the right to testify in his own defense, or to refuse to do so, the constitutional *116 privilege cannot be construed as a license to commit perjury. Ibid. The Court thus concluded that the Fifth and Fourteenth Amendments are not "violated by the use of prearrest silence to impeach a criminal defendant's credibility." 447 U.S. at 238, 100 S.Ct. at 2129, 65 L.Ed.2d at 95. In reaching this conclusion, the Court emphasized that "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." Id. at 239, 100 S.Ct. at 2129, 65 L.Ed.2d at 95.
Although the evolution of the law in this area is by no means complete, New Jersey has thus far taken a somewhat different approach. In State v. Deatore, 70 N.J. 100 (1976), our Supreme Court held that, as a matter of state law, a defendant's silence at or near the time of his arrest may not be used to impeach his trial testimony.[3]Id. at 112. See also State v. Lyle, 73 N.J. 403, 410 (1977). The Court stated that "a defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial...." 70 N.J. *117 at 115. Unlike the approach subsequently adopted by the United States Supreme Court in Doyle v. Ohio, supra, our Court expressed the view that the "rule of impropriety of cross-examination of a defendant with respect to silence in police custody ... should not depend on whether or not the [accused] received his Miranda warnings." Id. at 117, n. 10. Noting that "[t]he right to remain silent existed long before Miranda," the Court saw no "meaningful basis [for such] a distinction." Ibid.
The exact contours of the rule enunciated by our Supreme Court in State v. Deatore, supra, have yet to be defined. We note that Deatore and subsequent decisions in which the rule has been applied all involved post-arrest custodial silence. See, e.g., State v. Whitehead, 80 N.J. 343, 346-348 (1979); State v. Lyle, supra, 73 N.J. at 409; State v. Alston, 70 N.J. 95, 98 (1976). Cf. State v. Marks, 201 N.J. Super. 514, 530 (1985). We also observe that Deatore was decided after United States v. Hale, supra, but before Doyle v. Ohio, supra, and Jenkins v. Anderson, supra. Since the decision in Deatore was reached "as a matter of state law and policy" as to which stricter standards and controls may be imposed, State v. Deatore, supra, 70 N.J. at 112, it remains to be seen whether our Supreme Court will ultimately adopt the rationale of Jenkins v. Anderson, supra, and draw a distinction between prearrest and postarrest silence.
We do not find it necessary to decide that question in this case. We merely note the disarray in decisional treatment of this issue in other jurisdictions. While several states have opted to admit evidence of prearrest silence to impeach a defendant's trial testimony, see, e.g., People v. Redmond, 29 Cal.3d 904, 633 P.2d 976, 176 Cal. Rptr. 780 (Sup.Ct. en banc 1981); People v. Givans, 166 Cal. App.3d 793, 212 Cal. Rptr. 762 (App.Ct. 1985); People v. Free, 131 Cal. App.3d 155, 182 Cal. Rptr. 259 (App.Ct. 1982); Lebowitz v. State, 313 So.2d 473 (Fla.App.Ct. 1975), cert. den. 330 So.2d 19 (Fla.Sup.Ct. 1976); State v. Hunt, 72 N.C. App. 59, 323 S.E.2d 490 (App.Ct. 1984), *118 aff'd, 313 N.C. 593, 330 S.E.2d 205 (Sup.Ct. 1985), others have chosen to adopt stricter standards. See, e.g., People v. Conyers, 52 N.Y.2d 454, 420 N.E.2d 933, 438 N.Y.S.2d 741 (Ct. of App. 1981); People v. Lee, 110 A.D.2d 913, 488 N.Y.S.2d 738 (App.Ct. 1985); People v. Pressley, 93 A.D.2d 665, 462 N.Y.S.2d 864 (App.Ct. 1983); State v. Sabbah, 13 Ohio App.3d 124, 468 N.E.2d 718 (App.Ct. 1982); Farley v. State, 717 P.2d 111 (Okla. Cr. 1986).
Assuming, without deciding, that a defendant's failure to volunteer exculpatory information to the authorities prior to his arrest may generally be used to attack his credibility,[4] we find that impeachment by silence was inappropriate in this case. For silence to be probative, it must appear that the failure to speak was unnatural and that an ordinary person would have come forward with the exculpatory information under the circumstances. Here, however, the ambiguity of defendant's prearrest silence plainly diluted whatever probative force it might otherwise have had. A likely explanation was defendant's conscious reliance upon his right to remain silent. We also note that according to defendant's testimony he was unaware of the fact that anyone had been shot. We emphasize that defendant's trial testimony was only partially exculpatory. Defendant freely admitted that he had attempted to purchase cocaine in violation of the conditions of his probation. Clearly, it would not have been natural for the defendant to have come forward in the circumstances of this case and produce incriminating evidence against himself. While the use of defendant's prearrest silence would not violate due process standards under Jenkins v. Anderson, supra, his failure to volunteer incriminating information at the earliest possible time says little about *119 the truth of his trial testimony. To permit the use of his prearrest silence, if only for impeachment purposes, suggests that defendant had a duty to provide incriminating evidence against himself and, in our view, improperly burdens his right to testify in his own defense.
Although our research has not revealed any decisions directly on point, we note that the Supreme Judicial Court of Massachusetts reached a similar conclusion in Commonwealth v. Nickerson, 386 Mass. 54, 434 N.E.2d 992 (Sup.Jud.Ct. 1982). There, the Court held that impeachment by silence was improper where the defendant would have subjected himself to criminal charges had he come forward and apprised the authorities of the exculpatory story he ultimately gave in his trial testimony. Id. at 62, 434 N.E.2d at 997. The Court stated that "impeachment of a defendant with the fact of his prearrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was `natural' to expect the defendant to speak in the circumstances." Ibid.
As we have noted, we have no occasion here to address the broader propositions contained in defendant's constitutional arguments. While we recognize that New Jersey's common law privilege has historically been construed to afford greater protection than that given by the Fifth Amendment, see, e.g., In the Matter of Grand Jury Proceedings of Joseph Guarino, 104 N.J. 218, 229 (1986); State v. Vinegra, 73 N.J. 484, 490 (1977); State v. Deatore, supra, 70 N.J. at 115-116, we need not dwell upon the subject. Rather, we prefer to rest our decision upon the simple evidentiary principle that prearrest silence under the facts of this case lacked relevance and had little probative force. See Evid.R. 1(2).[5] We therefore conclude *120 that the trial judge committed error in permitting the prosecutor to cross-examine defendant concerning his prearrest failure to report the incident to the police.

II
We next address the question whether admission of this evidence was harmless error. At the outset, we note that "not every judicial error will have the effect of vitiating an otherwise valid conviction." State v. Downey, 206 N.J. Super. 382, 394 (App.Div. 1986). Even where the error is of constitutional dimension, the question whether a reversal is required "depends finally upon some degree of possibility that it led to an unjust verdict." State v. Macon, 57 N.J. 325, 335 (1971). While we have rested our holding on evidentiary principles rather than upon constitutional grounds, we are nevertheless aware of the peripheral involvement of the Fifth Amendment. In assessing the impact of the erroneous admission of this evidence, we have thus considered the harmless error standard set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh'g den. 386 U.S. 987, 87 S.Ct. 1283, 18 *121 L.Ed.2d 241 (1967). Chapman states that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-711.
Applying that standard, we find that the prosecutor's brief and isolated allusion to defendant's prearrest silence had no prejudicial impact. In the words of Chapman, we conclude that the error was harmless beyond a reasonable doubt. In reaching this conclusion, we again refer to defendant's detailed testimony, initially elicited on direct examination and subsequently pursued by the prosecutor on cross-examination, explaining the reason for his efforts to avoid disclosure of his participation in the attempt to obtain illegal drugs. Defendant's efforts to avoid detection included flight from the scene of the alleged robbery, his evasive responses to Deleva's and Giannetta's inquiries concerning what had transpired, his destruction of his bloody clothing and his attempt to secrete the charred remains. Defendant repeatedly explained that all this was done because of his fear that the authorities would revoke his probation if they were to learn of his attempt to purchase cocaine. Simply stated, the jury was well aware of defendant's attempt to prevent disclosure of his complicity in the failed attempt to obtain drugs and the reasons for it. The prosecutor's fleeting reference to defendant's prearrest silence added nothing to what the jury already knew.
Beyond this, we emphasize that the entire incident "occupied only [several] lines, as far as the jury was concerned, in the transcript" of a trial lasting two weeks. State v. Alston, supra, 70 N.J. at 98. See also State v. Whitehead, supra, 80 N.J. at 348. We also note that the subject matter was not specifically referred to in summation or in any other way.[6] In *122 the overall picture, we are fully convinced that the error was harmless beyond a reasonable doubt and cannot be said to have influenced the jury's verdict.

III
Defendant's remaining arguments are clearly without merit and require no further discussion. R. 2:11-3(e)(2). Specifically, we reject defendant's assertion that the prosecutor's statements in summation exceeded the bounds of fair comment. We are also entirely unpersuaded by defendant's contention that the trial judge committed reversible error in his instructions to the jury.
Accordingly, the judgment of conviction is affirmed.
NOTES
[1] A tinfoil was later discovered by the police in close proximity to Muhammed's automobile. A laboratory analysis disclosed that the tinfoil contained approximately one-eighth of an ounce of cocaine.
[2] Prior to its decision in Doyle v. Ohio, supra, the Court had held that a defendant's silence after rendition of the Miranda warnings lacked probative value at least when weighed against its prejudicial impact. United States v. Hale, 422 U.S. 171, 176-180, 95 S.Ct. 2133, 2136-2138, 45 L.Ed.2d 99, 104-107 (1975). The Court rested its decision on its supervisory authority over the federal courts. Ibid.
[3] Prior to its decision in Deatore, our Supreme Court had held in State v. Burt, 59 N.J. 156 (1971), cert. den. 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972), that under certain circumstances a defendant's failure to report an incident to the police may be admissible to impeach his trial testimony. The State argues that State v. Burt, supra, is dispositive of the question presented here. We reject this contention.

The underlying facts in Burt were markedly different from those in this case and, as pointed out in State v. Deatore, supra, "the opinion has to be read in the light thereof." 70 N.J. at 117-118. In Burt, the charge was murder  the shooting of defendant's friend. The defense at trial was that the shooting was accidental. The proofs up to the point of cross-examination were that defendant had not sought medical or other assistance for his injured friend after the incident, but rather had fled the scene without knowing whether he was dead or alive. As noted in Deatore, "[t]he purpose of the cross-examination was, in essence, to bring all this out and thus convince the jury that the trial testimony of accidental shooting could not be true." Id. at 118. In distinguishing Burt, the Court observed that "[i]t was in fact not a true case of silence in police custody as to an exculpatory story, but rather one of conduct, albeit non-action, after the charged crime inconsistent with defendant's [testimony] at trial." Ibid.
[4] We also note that the trial judge's instruction was defective in that it did not specifically confine the jury's consideration of defendant's prearrest silence to the issue of credibility. See Jenkins v. Anderson, supra. Cf. United States v. Harris, supra; State v. Ripa, 45 N.J. 199 (1965); State v. Kimbrough, 109 N.J. Super. 57 (App.Div. 1970).
[5] We also observe that in many cases the risk of prejudice is substantial when the prosecution attempts to impeach a defendant's testimony by his failure to make prearrest exculpatory statements. "Jurors who are not necessarily sensitive to the wide variety of alternative explanations for a defendant's pretrial silence, may ... construe such silence as an admission and ... draw an unwarranted inference of guilt." People v. Conyers, supra, 52 N.Y.2d at 457, 420 N.E.2d at 935, 438 N.Y.S.2d at 743. There are a variety of situations where an innocent suspect would not offer himself or his story to the police. He may believe that he has not committed a crime and thus has no reason to explain himself to the authorities. He may fear disbelief in his explanation by the police. His silence may be attributable to a mistrust or fear of law enforcement authorities. His failure to report an incident may be the result of his awareness that he has no obligation to speak or his caution arising from his knowledge that anything he says may be used against him or his belief that any attempt to exonerate himself would be futile. Accordingly, evidence of a defendant's prearrest silence may be "regarded as having minimal probative significance and ... a correspondingly low potential for advancing the truth-finding process even when offered solely for purposes of impeachment." Ibid. We do not suggest that a defendant's prearrest silence lacks probative force in all instances. We merely note that even where prearrest silence has evidential significance, the potential for prejudice may outweigh its probative force. See Evid.R. 4.
[6] Defendant argues that the prosecutor alluded to prearrest silence in her summation. We disagree with defendant's strained construction of the prosecutor's remarks. The prosecutor merely referred to defendant's flight from the scene which she characterized as conduct inconsistent with the hypothesis of innocence. We perceive no error in that regard. See State v. Allen, 53 N.J. 250, 252 (1969); State v. Mills, 51 N.J. 277, 286 (1968), cert. den. 393 U.S. 832, 89 S.Ct. 105, 21 L.Ed.2d 104 (1968).